**F I L E D**
United States Court of Appeals
Tenth Circuit

**SEP 7 2001**

**PATRICK FISHER**
Clerk

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

CITY OF PHILADELPHIA, acting
through its Board of Pensions and
Retirement, and RONALD T.
GOLDSTEIN, on behalf of themselves
and all others similarly situated,

    Plaintiffs-Appellants,

v.

FLEMING COMPANIES, INC.;
ROBERT E. STAUTH; R.
RANDOLPH DEVENING; DONALD
N. EYLER; KEVIN J. TWOMEY,

    Defendants-Appellees.

No.00-6081

---

**Appeal from the United States District Court
for the Western District of Oklahoma
(D.C. No. 96-CV-853-M)**

---

M. Richard Komins of Barrack Rodos & Bacine, Philadelphia, Pennsylvania
(Leonard Barrack of Barrack Rodos & Bacine, Philadelphia, Pennsylvania;
Sanford P. Dumain and William C. Fredericks of Milberg Weiss Bershad Hynes &
Lerach LLP, New York, New York; and Robert Nelson of Bass Bass & Nelson, El
Reno, Oklahoma, with him on the briefs) for Plaintiffs-Appellants.

Reid E. Robison of McAfee & Taft, P.C., Oklahoma City, Oklahoma (John N.
Hermes and James R. Webb of McAfee & Taft, P.C., Oklahoma City, Oklahoma;
Tower C. Snow, Jr. and Robert P. Varian of Brobeck, Phleger & Harrison LLP,
San Francisco, California; and Paul R. Bessette, P.C. of Brobeck, Phleger &
Harrison, LLP, Austin, Texas, with him on the brief) for Defendants-Appellees.

Before **EBEL**, **MCKAY** and **CUDAHY**,[*] Circuit Judges.

**EBEL**, Circuit Judge.

This case requires us for the first time to interpret the provisions of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4. Plaintiffs brought this consolidated class action lawsuit alleging securities fraud under the Securities Exchange Act of 1934 ("the Act"), see 15 U.S.C. §§ 78a et seq., and Rule 10b-5, see 17 C.F.R. § 240.10b-5, on behalf of all people who purchased stock in Fleming Companies, Inc. ("Fleming") during the period November 15, 1993, to March 14, 1996. Plaintiffs alleged that the individual Defendants, all current or former executives of Fleming, omitted material information regarding a pending lawsuit both from its required SEC filings and from its quarterly and annual reports issued during the class period. According to Plaintiffs, these alleged omissions caused corporate Defendant Fleming to file materially misleading documents with the SEC, and to issue materially misleading statements to current and potential investors, during the class period.

After Plaintiffs twice amended their complaint, the district court dismissed the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure,

---

[*] Honorable Richard D. Cudahy, United States Court of Appeals, Seventh Circuit, sitting by designation.

stating that the second amended complaint did not meet the pleading requirements for scienter set forth in the PSLRA, 15 U.S.C. § 78u-4(b)(1)(2).

This court has not yet ruled on what is required to plead scienter in a securities fraud case that falls under the PSLRA. Under the PSLRA, plaintiffs in securities fraud cases must plead facts giving rise to a "strong inference" of scienter. While allegations of motive and opportunity may be considered as part of the mix of information that may, in appropriate circumstances, give rise to a strong inference of scienter, we reject the argument that pleading motive and opportunity, without more, provides an alternative method to establish scienter.

Reviewing Plaintiffs' complaint under these standards, we find that they have not pled facts giving rise to a strong inference that Defendants intentionally or recklessly failed to disclose the pending litigation in a manner that would give rise to liability for securities fraud. Further, because we find that Plaintiffs have not sufficiently pled a primary violation of the securities laws, we find that Plaintiffs' claims of controlling person liability necessarily fail as well.

We therefore AFFIRM the dismissal of Plaintiffs' complaint.

# BACKGROUND[1]

## A. The Defendants

Corporate Defendant Fleming Companies, Inc. ("Fleming") is a large food wholesaler servicing more than 10,000 retail food stores, including 3,500 supermarkets, and itself operates approximately 370 company-owned stores, of which approximately 335 are supermarkets. Fleming's common stock is listed on the New York, Midwest and Pacific stock exchanges. Plaintiffs allege that "millions of shares" of Fleming stock were traded during the class period, November 15, 1993, to March 14, 1996, and that Fleming listed 13,300 shareholders of record, and 20,500 beneficial owners with shares held in street name by brokerage firms and financial institutions, in its 1995 Annual Report.

The four individual Defendants, Robert E. Stauth, R. Randolph Devening, Donald N. Eyler, and Kevin J. Twomey, were all officers of Fleming during the class period.[2] During the class period, each of the individual Defendants signed

---

[1] Because this appeal arises from an Order of Dismissal pursuant to Rule 12(b)(6), we accept Plaintiffs' version of the facts for purposes of this appeal.

[2] Specifically, Robert E. Stauth was, during the class period, the President, Chief Executive Officer and Chairman of the Board of Directors of Fleming. S. Randolph Devening was Executive Vice President and Chief Financial Officer from 1989 to 1993, and also served as Vice Chairman and Director of Fleming from 1993 until his departure from the company in July 1994. Donald N. Eyler was Senior Vice President, Controller and Chief Accounting Officer of Fleming prior to his departure from the company in March 1995. Last, Kevin Twomey has been the Vice President, Controller and Principal Accounting Officer of Fleming

(continued...)

at least one of the publicly filed documents that Plaintiffs now allege were materially false and misleading.

B.  The David's Litigation

In dealing with its customers both prior to and during the class period, Fleming had a number of different pricing arrangements, one of which was the utilization of "cost-plus" contracts.  Under its "cost-plus" contracts, Fleming agreed to charge customers its actual costs plus a fixed percentage markup based upon the type and quantity of items purchased.  This pricing arrangement, at least in theory, allowed customers to reap the benefits of Fleming's ability to negotiate low prices with its wholesalers and distributors.  Both prior to and during a portion of the class period, Fleming entered into "cost-plus" contracts with an unspecified number of its customers.

Beginning in 1989, Fleming entered into a series of "cost-plus" contracts to provide food and other products to David's Supermarkets, Inc. ("David's"), a chain of supermarkets located in northern Texas.  These contracts specified that Fleming would provide goods to David's at Fleming's cost plus a fixed percentage over the actual cost, e.g., supplying groceries, dairy products and meat

---

[2](...continued)
since March 1995.

at cost plus 3.45%, supplying frozen foods and frozen meat at cost plus 6.25%, and supplying produce at cost plus 7.65%.

On August 24, 1993, David's filed a lawsuit in Texas state court alleging that Fleming had artificially inflated its actual costs and had pocketed discounts and other buyers' incentives, and thus that it had systematically overcharged David's under the "cost-plus" contracts. Specifically, the David's complaint alleged that Fleming had artificially increased its costs through the use of paper transfers within the Fleming corporate structure, and by refusing to pass on to David's substantial savings realized by Fleming through manufacturers' rebates, promotional and volume discounts, and "forward buying."[3] The David's complaint thus alleged breach of contract, fraud, and violations of the Texas Deceptive Trade Practices Act ("Texas Act"), and it sought damages of "at least" $ 20 million, trebled under the Texas Act to total $ 60 million, and exemplary damages of "at least $ 50 million." The initial complaint in the David's Litigation thus requested damages of approximately $ 110 million, which represented approximately 3.5% of Fleming's total assets in 1993 and 2.4% of Fleming's total assets in 1994. The $110 million damage request also represented approximately 10.37% of Fleming's total net worth as reported in its 1993 Annual

---

[3] "Forward buying" is where a company such as Fleming promises to buy a large quantity of goods over a long period of time in exchange for discount prices.

Report (filed March 15, 1994), and 10.19% of Fleming's total net worth as reported in its 1994 Annual Report (filed March 13, 1995). Plaintiffs did not allege financial data from which we could determine what percentage of Fleming's current assets the $ 110 million damages claim represented in 1993 or 1994.

The complaint was later amended on or about September 19, 1995,[4] to include a damages request of "at least $ 50 million" in actual damages, trebled

---

[4] Plaintiffs did not plead the exact date of amendment in the David's Litigation, stating instead that "David's subsequently amended its damages claims" to include higher damages amount. Because we concluded that the timing of the amended damages claim is important, and because Plaintiffs referenced the underlying documents in the David's Litigation but did not provide the specific details necessary to evaluate their claims, we asked Plaintiffs to supplement the record with the amended complaint in the David's Litigation. Our review of the complaint in the David's Litigation reveals two dates of amendment to the damages claims. On the first date, on or about September 19, 1995, the plaintiffs amended their claims to approximately $250 million; on the second date, on or about February 9, 1996, the plaintiffs amended their damages claims to approximately $ 445,101,000. We take judicial notice of the dates of amendment to the David's Litigation damages claims. See Fed. R. Evid. 201(b)(2), (c), (f); United States ex rel. Robinson Rancheria Citizens Council, 971 F.2d 244, 248 (9th Cir. 1992) (taking judicial notice of "directly related" and potentially "dispositive" state court proceedings, even where information was not before the district court, when reviewing district court grant of motion to dismiss). See also GFF Corp. v. Associated Wholesale Grocers, 130 F.3d 1381, 1384 (10th Cir. 1997) ("[I]f a plaintiff does not incorporate by reference or attach a document to its complaint, but the document is referred to in the complaint and is central to the plaintiff's claim, a defendant may submit an indisputably authentic copy to the court to be considered on a motion to dismiss."); id. at 1385 ("If the rule were otherwise, a plaintiff with a deficient claim could survive a motion to dismiss simply by not attaching a dispositive document upon which the plaintiff relied.")

under the Texas Act to total "at least $ 150 million," and exemplary damages of "at least $ 100 million." The amended complaint in the David's Litigation thus requested damages of approximately $ 250 million. We do not know what percentage of Fleming's total or current assets, or total net worth, the amended damages claim represented at the time of amendment because Plaintiffs did not plead those financial figures for 1995.

Finally, the complaint was again amended on or about February 9, 1996, to include damages claims of: $ 54,632,000 in actual damages for breach of contract and related claims, trebled under the Texas Act to $ 163,896,000; actual damages of $ 38,655,000 for fraud; and exemplary damages in the amount of $ 242,550,000. The total amount requested in the damages claim in the David's Litigation as amended in February 1996 was therefore $ 445,101,000. Again, because Plaintiffs did not include information about Fleming's financial situation in late 1995 or early 1996, we do not know what percentage of Fleming's total or current assets, or total net worth, this figure represented at the time of amendment.

The David's Litigation went to trial in February 1996 and, on March 14, 1996, the jury returned a verdict of liability against Fleming. On March 18, 1996, it was reported by the media that the jury in the David's Litigation had assessed punitive damages of "at least $ 100 million," bringing the total damage award in

that case to approximately $ 200 million.  The final damages amount assessed against Fleming in the David's Litigation was approximately $ 200 million plus attorney's fees and costs.

In response to the verdict being announced, the price of Fleming shares closed at $17.50 on March 14, down from $19.63 the previous day.  On March 18, when the punitive damages award was announced, Fleming shares closed at $15.13.  On March 28, Fleming announced that it was cutting its quarterly dividend from $.30 to $.02 to raise funds for an appeal bond, and the price of Fleming shares dropped to $14.00.

In May 1996, the David's Litigation verdict was set aside due to revelations that the trial judge had an undisclosed conflict of interest based on his unrelated financial dealings with the plaintiffs in that case.  The case was assigned to another judge and set for re-trial.  On March 25, 1997, however, Fleming settled the David's Litigation for $19.9 million, plus an additional undisclosed amount paid by Fleming's directors' and officers' liability insurer.[5]  Plaintiffs assert that the value of Fleming's stock never fully recovered, even after the verdict and damage award were vacated.

---

[5]  Subsequent to the David's Litigation verdict, at least three other customers of Fleming, Red Apple Supermarkets, Inc., Furr's Supermarkets, Inc., and Randalls Food Markets, Inc., filed lawsuits or requests for arbitration asserting allegations similar to those presented in the David's Litigation.

C. Other Fleming Business Concerns During the Class Period

Allegedly, Fleming was under pressure in late 1993 to change its billing practices, in part because customers were complaining about inflated prices and in part because "it was apparent to Fleming that changes in the way grocery manufacturers conducted business were eliminating . . . many of the opportunities for discount buying that had made Fleming's" pricing practices so profitable. Fleming responded by creating a new marketing plan, the Fleming Flexible Marketing Plan ("FFMP"), that sought to convert all of its customers to "cost-plus" contracts. The FFMP advertising campaign emphasized that all discounts would actually be passed through to Fleming's customers, necessarily implicating Fleming's integrity as a supplier.[6] Plaintiffs allege that the FFMP, the success of

[6] Under the FFMP, Fleming promised to pass through to its customers all purchase discounts – which, according to Plaintiffs, had previously contributed significantly to Fleming's profitability – thereby diminishing Fleming's profits. In addition to being upset about Fleming's non-disclosure of the David's Litigation, Plaintiffs are therefore also upset that Fleming did not disclose the extent to which the change in its pricing policies through the FFMP would affect its profits. We note, however, that Plaintiff's Statement of Issues in their brief to this court lists only three issues, all of which are related to Fleming's non-disclosure of the David's Litigation and none of which are related to any alleged misrepresentations regarding the impact the FFMP may have had on future profits of the company. Similarly, the vast majority of Plaintiff's arguments relate only to the non-disclosure of the David's Litigation. The additional allegations regarding Fleming's alleged misrepresentations about the FFMP's effect on future profits are presented only in passing. Therefore, we will address only Plaintiffs' arguments regarding the David's Litigation and will not address their alternate argument regarding any alleged non-disclosures related to the effect of the FFMP

(continued...)

which depended heavily on Fleming's customers believing that Fleming would, in fact, pass through all discounts to its customers, would have been damaged by Fleming's disclosure of the David's Litigation due to allegations in that case that Fleming promised to charge David's based upon Fleming's actual costs but instead systematically, improperly and fraudulently overcharged David's.

## D.  Fleming's Disclosures During the Class Period

During the class period, November 13, 1993, through March 14, 1996, Fleming filed quarterly and annual reports with the Securities and Exchange Commission ("SEC"), and provided those reports to its shareholders and other potential investors.  In addition, on December 8, 1994, Fleming filed a registration statement with the SEC for the offering of $ 500 million in senior notes.[7]

---

[6](...continued)
on profits.  See Ambus v. Granite Bd. of Educ., 975 F.2d 1555, 1558 n.1 (10th Cir. 1992) (holding that an issue mentioned in the brief on appeal but not addressed is waived), modified on other grounds on reh'g, 995 F.2d 992 (10th Cir. 1993).

[7]  According to Plaintiffs, by the time the registration statement was filed in December 1994, "the parties in the David's Litigation had already served a total of at least seven requests for the production of documents, two sets of interrogatories, and a request for admissions, and had taken the depositions of at least six witnesses."  In addition, Fleming had moved for partial summary judgment in the David's Litigation on November 4, 1994, a fact from which Plaintiffs infer that Fleming recognized the likelihood of trial on at least some of

(continued...)

In its 1993 Annual Report, Fleming explicitly disclosed the Premium Sales Litigation,[8] consisting of two lawsuits filed in the U.S. District Court for the District of Miami in which "unspecified but large losses" were alleged. According to the report, Fleming was "unable to conclude that an adverse resolution is not reasonably likely," and thus was disclosing the lawsuits despite Fleming's inability to "predict the potential liability, if any, to the company." Fleming included this explicit disclosure of the Premium Sales Litigation despite its assertion that "management does not believe that an adverse outcome is likely that would materially affect the company's consolidated financial position." In regard to other pending litigation, Fleming included in its 1993 Annual Report only a blanket litigation disclosure, which stated:

> The company is party to various other litigation, possible tax assessments and other matters, some of which are for substantial amounts, arising in the ordinary course of business. While the ultimate effect of such actions cannot be predicted with certainty, the company expects that the outcome of these matters will not result in a material adverse effect on its consolidated financial position or results of operations.

---

[7](...continued)
the issues raised in the David's Litigation complaint.

[8] The Premium Sales Litigation involved allegations that Fleming employees participated in fraudulent activities, within the scope of their regular employment, by taking money for confirming transactions which had not occurred.

Similar statements regarding both the Premium Sales Litigation and other generic litigation to which Fleming was a party were made in Fleming's annual reports filed on March 25, 1994 (1993 Annual Report), and March 28, 1995 (1994 Annual Report),[9] as well as in Fleming's Form 10-Q quarterly reports filed on November 15, 1993, May 31, 1994, August 22, 1994, November 15, 1994, June 5, 1995,[10] August 29, 1995, and November 20, 1995.

The David's Litigation was not explicitly disclosed until Fleming filed its 1995 Annual Report on March 14, 1996. At that time, Fleming explained the David's Litigation as follows:

> The company and one of its former subsidiaries were named in a lawsuit filed in the District Court in Johnson County, Texas, in which the plaintiff alleges liability on the part of the company as a result of breach of contract, fraud, conspiracy, and violation of the Texas Deceptive Trade Practices Act. Plaintiff seeks actual damages alleged to equal or exceed $50 million, treble damages, exemplary damages, attorneys' fees, interests, and costs. The case went to trial in February 1996.

---

[9] By the time Fleming's 1994 Annual Report was issued, Fleming's motion for partial summary judgment in the David's Litigation had been denied (on January 24, 1995) and at least eleven depositions, including the deposition of Defendant Eyler, had been taken.

[10] By the time the June 5, 1995, quarterly report was issued, Plaintiffs allege that, in addition to Fleming's motion for partial summary judgment having been denied, more than twenty depositions had been taken, Defendant Stauth had submitted an affidavit in response to a subpoena duces tecum issued by the David's Litigation plaintiffs, and "voluminous written discovery had been propounded and answered by both plaintiffs and defendants" to the David's Litigation.

Management is unable to predict a potential range of monetary exposure, if any, to the company, but believes the claims asserted are without merit and that a material adverse effect of the company's consolidated financial position is less than probable. However, based upon the large recovery sought, an unfavorable result could have a material adverse effect on the company.

The verdict of liability in the David's Litigation was announced that same day.[11]


E.  This Litigation

The nine class actions consolidated in this case were filed starting in March 1996, when the David's Litigation and verdict were specifically disclosed by Fleming. The actions were brought on behalf of all people who purchased stock in Fleming during the class period, and alleged that the individual Defendants had omitted material information regarding the David's Litigation from Fleming's required SEC filings filed during the class period, as well as from quarterly and annual reports distributed to its shareholders and other potential investors.

---

[11]  The press release issued by Fleming on March 14, 1996, stated:

David's Supermarkets, Inc., a former customer of [Fleming] . . . filed suit against Fleming and one of its retired officers in 1993. . . . Today, a Johnson County, Texas jury in the 18th Judicial State District Court returned a verdict against Fleming and the retired officer in the first phase of the trial. The second phase begins tomorrow and addresses the possible imposition of punitive damages. Fleming said that it is extremely disappointed with the verdict and is awaiting the outcome of the second phase of the trial, which should be completed on Friday, March 15.

Because the David's Litigation involved significant damages claims that could result in a materially adverse verdict against the company but was nonetheless not explicitly disclosed in Fleming's required SEC filings during the class period, asserted Plaintiffs, Fleming's public disclosures during the class period were materially misleading and thus constituted a violation of Section 10(b) of the Securities Exchange Act of 1934, see 15 U.S.C. §§ 78j, and Rule 10b-5, see 17 C.F.R. § 240.10b-5.

On March 26, 1997, the City of Philadelphia and Ronald Goldstein were named Lead Plaintiffs, and their counsel Lead Counsel. Plaintiffs filed a Consolidated Amended Class Action Complaint on April 30, 1997, which was dismissed with leave to amend by the district court on March 4, 1999. In its dismissal order, the district court found that Plaintiffs had not adequately pled scienter as required by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4, which states that allegations of scienter require a plaintiff to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," 15 U.S.C. § 78u-4(b)(2).[12] Specifically, the district court stated:

---

[12] Because the district court dismissed the complaint on the basis of Plaintiffs' inadequate allegations of scienter, it did not "address[] the sufficiency of plaintiffs' allegations as to materiality, reliance, and causation/damages."

[P]laintiffs allege each defendant acted with actual knowledge or with reckless disregard of the true facts misrepresented or omitted in Fleming's public statements and filings. Plaintiffs base this allegation upon defendants' positions as senior officers of Fleming, defendants' receiving periodic reports of litigation matters and investigations, and defendants' being consulted and advised about Fleming's pricing policies. Plaintiffs, however, never name any specific report defendants may have reviewed or identify specific advice defendants may have given or received involving either the David's Litigation, Fleming's pricing policies, or the basis for implementing the FFMP, Fleming's restructuring and re-engineering program. Plaintiffs simply make conclusory allegations that defendants were senior officers; therefore, they had actual knowledge or should have had actual knowledge of the "true facts." Such conclusory allegations of scienter are not sufficient under Rule 9(b),[13] much less under the PSLRA.

The district court similarly rejected Plaintiffs' allegations regarding Defendants' motive and opportunity to make deliberately and materially misleading omissions regarding the David's Litigation.

Plaintiffs filed a Second Amended Class Action Complaint ("Complaint") on April 1, 1999. The later dismissal of that Complaint is the subject of the instant appeal. In the Complaint, Plaintiffs included a section entitled "Additional Scienter Allegations," in which they stated:

---

[13] Federal Rule of Civil Procedure 9(b), which used to govern allegations of fraud in all cases filed in the federal courts, states: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." The scienter pleading requirements of the PSLRA, see 78 U.S.C. § 78u-4(b)(2), supercede the provisions of Rule 9(b) in securities fraud cases. See In re: Advanta Corp. Sec. Litig., 180 F.3d 525, 531 & n.5 (3d Cir. 1999).

Fleming and the individual defendants acted with scienter in that each defendant [was] aware of and/or recklessly disregarded the material facts set forth herein concerning the David's Litigation and the Company's fraudulent business practices; knew that the public documents and statements issued or disseminated in the name of the Company complained of herein were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and/or recklessly participated in the issuance or dissemination of such statements or documents in violation of the federal securities laws.[14]

---

[14] This statement was supported by the following allegations:

1.  Fleming was aware of the David's Litigation no later than September 19, 1993, and, at various times during the class period, was aware both that the litigation would involve extensive discovery and that Fleming's motion for partial summary judgment in that case had been denied;

2.  Defendant Stauth either had actual knowledge of the David's Litigation or was recklessly indifferent to it by September 19, 1993, because he was then President and CEO of Fleming, and because: (a) Stauth had "an affirmative duty to keep informed of – and to publicly disclose . . . – the status of all potentially material litigation against the Company," and (b) Stauth admitted in a deposition in the David's Litigation on May 4, 1995, that he was aware of the litigation;

3.  Defendant Eyler had knowledge of the David's Litigation or was recklessly indifferent to it by September 19, 1993, because he was then Senior Vice President, Controller and CAO of Fleming, and because: (a) Eyler had "an affirmative duty to keep informed of – and to publicly disclose . . . – the status of all potentially material litigation against the Company," and (b) he was deposed in the David's Litigation on February 22, 1995;

4.  Defendant Devening, "by virtue of [his] senior positions and management responsibilities" had actual knowledge of the David's Litigation or was recklessly indifferent to it by September 19, 1993, and was also actually aware or recklessly indifferent to the "fraudulent business practices" giving rise to that lawsuit;

5.  Defendant Twomey, who joined Fleming as Controller and CAO in

(continued...)

[14](...continued)

March 1995, "had actual knowledge of, or was recklessly indifferent to," the David's Litigation "no later than shortly after" he joined the company, and was also made actually aware or was recklessly indifferent to the "fraudulent business practices" giving rise to that lawsuit from "shortly after" he joined the company;

6.   Each of the individual Defendants was aware of the pricing policies that formed the basis of the lawsuit, as demonstrated both by their positions as senior officers of the company and by their involvement with various company policies and documents related to the pricing policy, as evidenced by:

   a.   An internal memorandum dated October 3, 1990, on which Eyler was copied, stating "some of the 1989 and most of the 1990 vendor invoices for private label purchases that we converted to direct-bill are in the division files with inflated costs (inside margin billed in)" (emphasis added);

   b.   An internal memorandum dated February 14, 1991, stating, "Please be sure that when you send invoice copies to vendors or to the Divisions that the vendor cost is not displayed.  If you xerox the [Fleming's Food Marketing Services Division ("FMSD")] office copy, please cover this data." (emphasis added by Plaintiffs);

   c.   An internal memorandum dated October 3, 1991, in which the controller of Fleming's FMSD stated, "gross invoice [from vendor] is inflated because of the private label inside margin (which is paid to [FMSD] by check monthly)." (emphasis in original memorandum);

   d.   Fleming's repeated requests for its vendors to "inflate their billings to Fleming and then rebate the excess to Fleming," as evidenced by: (1) a memo dated July 22, 1991, stating that Fleming had negotiated a 2% cash discount on one invoice due to its "request to artificially inflate the cost to build margin;" (2) a letter dated March 28, 1990, that Fleming sent to a manufacturer and which stated, "The invoicing will also change to be billed direct to the division. . . . The 'delivered cost' is the

(continued...)

Finally, Plaintiffs alleged five motives that the individual Defendants might have had to conceal the David's Litigation despite their "knowledge" that the litigation was material and thus subject to disclosure: (1) to facilitate notes offerings on December 8, 1994; (2) to avoid jeopardizing the success of the

_____

[14](...continued)
price negotiated [by Fleming] with [the manufacturer]. The 'markup' is the amount added to the cost."; and (3) an April 2, 1990, letter sent to a manufacturer which stated, "The 'delivered cost' is the cost negotiated between Fleming and Premium Beverage. The 'markup' column is the margin for the division. The 'division sell' is the price I need for [the manufacturer] to invoice the divisions."

    e.    Testimony by Vernon Floyd, head of Fleming's San Antonio division, in a deposition taken in the David's Litigation that Fleming policy dictated that Fleming employees were "not . . . at liberty to explain" that Fleming's reported costs "[did] not in all instances reflect the actual manufacturers cost to Fleming" and that employees were instructed not to explain that the cost reported to the buyer "would not reflect the actual manufacturer cost to Fleming";

    f.    Knowledge and discontent among Fleming's cost-plus customers that Fleming was not passing through all discounts, as evidenced by an internal memorandum regarding an October 1989 "credibility workshop" that included suggestions for how to answer questions related to Fleming's retention of cash discounts and discounts for forward-buying, and Fleming's "mark[ed] up" prices on private label goods.

7.    Defendants' explicit disclosure of other pending litigation, but not the David's Litigation, even though the David's Litigation involved similar amounts of money, and was further in progress, than the other explicitly disclosed pending cases against Fleming, e.g., the Premium Sales Litigation.

FFMP; (3) to minimize the possibility of future lawsuits alleging similar claims; (4) to "protect and enhance their executive positions and the substantial compensation and prestige they obtained thereby;" and (5) to enhance the value of their own Fleming stock.

Again, Defendants filed a motion to dismiss. In ruling on the motion, the district court noted that many of the "additional" scienter allegations contained in the Complaint had already been found insufficient by the district court when dismissing the first complaint filed by Plaintiffs. In regard to Plaintiffs' truly "additional" allegations of scienter, the district court found them similarly deficient, stating: "[T]he fact defendants were aware of the David's Litigation does not automatically lead to the inference [that] they intentionally or recklessly failed to disclose the litigation[.] . . . [P]laintiffs' allegations at most support a finding of simple negligence, which is not sufficient to satisfy the scienter pleading requirement of the PSLRA."

The instant appeal followed.

## DISCUSSION

A. <u>Standard of Review</u>

We review de novo a district court's dismissal of a complaint under Federal Rule of Civil Procedure 12(b)(6). <u>See</u> <u>Grossman v. Novell, Inc.</u>, 120 F.3d 1112, 1118 (10th Cir. 1997). In reviewing a district's court's grant of a Rule 12(b)(6)

motion to dismiss, "all well-pleaded factual allegations in the . . . complaint are accepted as true and viewed in the light most favorable to the nonmoving party." Sutton v. Utah State Sch. for the Deaf & Blind, 173 F.3d 1226, 1236 (10th Cir. 1999).

B.  Statute and Rule

Section 10(b) of the Act states:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange –
> . . .
> (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

See 15 U.S.C. § 78j.

Rule 10b-5 provides, in relevant part:

> It shall be unlawful for any person . . .
> . . .
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . .
>     . . .
> in connection with the purchase or sale of any security.

See 17 C.F.R. § 240.10b-5.

C.  Analysis

    1)  Pleading Requirements in Securities Fraud Cases

        a.  Pre-PSLRA Standards

In a case addressing pleading standards pre-PSLRA,[15] this court held that to state a claim under Section 10(b) of the Act and Rule 10b-5 a plaintiff must allege: "(1) a misleading statement or omission of a material fact; (2) made in connection with the purchase or sale of securities; (3) with intent to defraud or recklessness; (4) reliance; and (5) damages." Grossman v. Novell, Inc., 120 F.3d 1112, 1118 (10th Cir. 1997).  Before the passage of the PSLRA, the pleading requirements for scienter in the securities context were governed by Federal Rule of Civil Procedure 9(b), which dictates that "averments of fraud . . . be stated with particularity." Id. at 1125.

The term "scienter" has been defined by the Supreme Court of the United States as "a mental state embracing intent to deceive, manipulate, or defraud." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12 (1976).  The Supreme Court has further elaborated on the meaning of the term by stating: "The words 'manipulative or deceptive' used in conjunction with 'device or contrivance' strongly suggest that § 10(b) was intended to proscribe knowing or intentional

---

[15] Grossman was decided after the enactment of the PSLRA but, because the initial complaint was filed prior to the effective date of the PSLRA, December 22, 1995, the case was governed by pre-PSLRA law. See 120 F.3d at 1118 n.4.

misconduct." Id. at 197. Recklessness, defined as "conduct that is an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it," can also satisfy the scienter requirement for Section 10(b). Anixter v. Home-Stake Prod. Co., 77 F.3d 1215, 1232 (10th Cir. 1996) (citations and quotation marks omitted). Simple negligence, however, does not satisfy the scienter requirement. See Bd. of County Comm'rs of San Juan County v. Liberty Group, 965 F.2d 879, 883 (10th Cir. 1992); Ernst & Ernst, 425 U.S. at 197.

### b. The Private Securities Litigation Reform Act ("PSLRA")

"The enactment of the PSLRA in 1995 marked a bipartisan effort to curb abuse in private securities lawsuits, particularly the filing of strike suits."[16] Greebel v. FTP Software, Inc., 194 F.3d 185, 191 (1st Cir. 1999). The PSLRA[17]

---

[16] A "strike suit" is defined as:

Shareholder derivative action begun with [the] hope of winning large attorney fees or private settlements, and with no intention of benefitting [the] corporation on behalf of which [the] suit is theoretically brought.

Black's Law Dictionary 1423 (6th ed. 1990).

[17] The PSLRA applies to all private securities actions filed after December 22, 1995, the effective date of the PSLRA. Plaintiffs' original complaint was

(continued...)

thus mandates a more stringent pleading standard for securities fraud actions in general, and for scienter allegations in particular. The PSLRA requires that a complaint asserting a violation of Section 10(b) of the Act "shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding a statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). The PSLRA also heightens the standard for pleading scienter with the following requirement:

> In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, <u>state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind</u>.

15 U.S.C. § 78u-4(b)(2) (emphasis added).

According to the Conference Committee Report, the PSLRA was intended to eliminate some of the abuses experienced in private securities litigation, such as "the routine filing of lawsuits . . . whenever there is a significant change in an issuer's stock price," the "abuse of the discovery process to impose costs so burdensome that it is often economical for the victimized party to settle," and the "manipulation by class action lawyers of the clients they purportedly represent."

---

[17](...continued)
filed on May 30, 1996, and thus the PSLRA applies to this case.

See H.R. Conf. Rep. No. 104-369, at 31, reprinted in 41 Cong. Rec. H13692 (daily ed. Nov. 28, 1995). The Conference Committee thus adopted a very stringent pleading standard for securities plaintiffs, purportedly higher than any federal court had imposed up to that point in time, as a means to discourage spurious securities lawsuits. See id. at 41 ("Regarded as the most stringent pleading standard, the Second Circuit requirement is that the plaintiff state facts with particularity, and that these facts, in turn, give rise to a 'strong inference' of the defendant's fraudulent intent. Because the Conference Committee intends to strengthen existing pleading requirements, it does not intend to codify the Second Circuit's case law interpreting this pleading standard.").

### c. Pleading Scienter Under the PSLRA

As stated earlier, the appropriate level of scienter in securities fraud cases is "a mental state embracing intent to deceive, manipulate, or defraud," Ernst & Ernst, 425 U.S. at 193 n.12, which includes recklessness, see Anixter, 77 F.3d at 1232. Prior to the passage of the PSLRA, the Second Circuit had held that a strong inference of fraudulent intent in securities fraud cases could be established either by: (1) alleging facts constituting strong circumstantial evidence of "conscious misbehavior or recklessness," or (2) alleging that Defendants had the motive and opportunity to commit securities fraud. See Shields v. Citytrust

Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir. 1994). As noted above, however, the PSLRA heightened the pleading requirements for securities fraud cases generally, and particularly in regard to the scienter element, and the legislative history suggests that Congress specifically intended a pleading standard stricter than the standard then prevailing in the Second Circuit.

Currently, six federal appellate courts – but not the Tenth Circuit – have issued published opinions interpreting the PSLRA to determine the appropriate pleading standard for scienter under that statute. With regard to the continued viability of recklessness as a substantive pleading standard for scienter under the PSLRA, five circuit courts agree that plaintiffs can adequately plead scienter by setting forth facts raising a "strong inference" of intentional or reckless misconduct.[18] See Greebel v. FTP Software, Inc., 194 F.3d 185 (1st Cir. 1999); Press v. Chemical Investment Servs. Corp., 166 F.3d 529 (2d Cir. 1999); In re: Advanta Corp. Sec. Litig., 180 F.3d 525 (3d Cir. 1999); Helwig v. Vencor, Inc., 251 F.3d 540 (6th Cir. 2001) (en banc); Bryant v. Avado Brands, Inc., 187 F.3d 1271 (11th Cir. 1999). We agree. The six circuits have, however, reached three different conclusions regarding the alternative "motive and opportunity" means of pleading scienter. Before we consider the continuing viability of the pre-PSLRA

_____

[18] The sixth circuit to rule on this issue has held that such pleadings are adequate when raising a "strong inference" of "deliberate recklessness." See In re Silicon Graphics Inc. Sec. Litig., 183 F.3d 970, 979 (9th Cir. 1999).

"motive and opportunity" method of pleading scienter, however, we turn briefly to the more direct pleading method of intentional fraud or recklessness.

### 1. Pleading intentional fraud or recklessness

"Intentional misconduct is easily identified since it encompasses deliberate illegal behavior."  See Novak v. Kasaks, 216 F.3d 300, 308 (2d Cir. 2000), cert. denied, 531 U.S. 1012 (2000). Recklessness is much harder to define adequately. See Novak, 216 F.3d at 308.   In Anixter, we stated both that "recklessness satisfies the scienter requirement for a primary violation of § 10(b)" and that recklessness is defined as "conduct that is an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it."  77 F.3d at 1232 (quotation marks omitted); see also San Juan County, 965 F.2d at 883; Hackbart v. Holmes, 675 F.2d 1114, 1117 (10th Cir. 1982).

Courts have been cautious about imposing liability for securities fraud based on reckless conduct, however.  See Novak,  at 309 ("[W]e have identified several important limitations on the scope of liability for securities fraud based on reckless conduct.").  Plaintiffs should not be allowed to proceed with allegations of "fraud by hindsight," for example, because corporate officials should be liable for failing to reveal only "those material facts reasonably available to them."  See

id. "Thus, allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud." Id. We explained our rejection of the "fraud by hindsight" method of pleading in securities fraud cases in Grossman, 120 F.3d at 1124, in which we stated:

> What makes many securities fraud cases more complicated is that often there is no reason to assume that what is true at the moment plaintiff discovers it was also true at the moment of the alleged misrepresentation, and that therefore simply because the alleged misrepresentation conflicts with the current state of facts, the charged statement must have been false. Securities fraud cases often involve some more or less catastrophic event occurring between the time the complained-of statement was made and the time a more sobering truth is revealed (precipitating a drop in stock price). . . . In the face of such intervening events, a plaintiff must set forth, as part of the circumstances constituting fraud, an explanation as to why the disputed statement was untrue or misleading when made.

Id. (emphasis in original) (quoting In re GlenFed Sec. Litig., 42 F.3d 1541, 1548-49 (9th Cir. 1994) (en banc)).

Further, allegations that the defendant possessed knowledge of facts that are later determined by a court to have been material, without more, is not sufficient to demonstrate that the defendant intentionally withheld those facts from, or recklessly disregarded the importance of those facts to, a company's shareholders in order to deceive, manipulate, or defraud. As the Seventh Circuit explained in Schlifke v. Seafirst Corp., 866 F.2d 935 (7th Cir. 1989):

> The plaintiffs submit that the Bank's actual knowledge of the facts withheld amply establishes the necessary degree of scienter; however, this argument misconstrues the relevant inquiry. The question is not merely whether the Bank had knowledge of the undisclosed facts; rather, it is the <u>danger of misleading buyers</u> that must be actually known or so obvious that any reasonable man would be legally bound as knowing.

Id. at 946 (emphasis in original). This reading of the statute and Rule comports with the Supreme Court's definition of scienter, i.e., "intent to deceive, manipulate, or defraud" and "knowing or intentional misconduct." Thus, to establish scienter in a securities fraud case alleging non-disclosure of potentially material facts, the plaintiff must demonstrate: (1) the defendant knew of the potentially material fact, and (2) the defendant knew that failure to reveal the potentially material fact would likely mislead investors. The requirement of knowledge in this context may be satisfied under a recklessness standard by the defendant's knowledge of a fact that was so obviously material that the defendant must have been aware both of its materiality and that its non-disclosure would likely mislead investors.

Finally, "allegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim." <u>Novak</u>, 216 F.3d at 309. Only where such allegations are coupled with evidence that the violations or irregularities were the result of the defendant's fraudulent intent to mislead investors may they be sufficient to state a claim.

## 2. Alternatively, the Pre-PSLRA Method of Pleading: Motive and Opportunity

Prior to the passage of the PSLRA, several circuit courts of appeals had held that scienter could be alleged through a showing of the defendant's motive and opportunity to commit securities fraud. "Motive would entail concrete benefits that could be realized by one or more of the false statements and wrongful non-disclosures alleged. Opportunity would entail the means and likely prospect of achieving concrete benefits by the means alleged." Novak, 216 F.3d at 307. To succeed in establishing scienter with a "motive and opportunity" pleading, plaintiffs had to allege "that defendants benefitted in some concrete and personal way from the purported fraud," as when the defendants made material misrepresentations to maintain a high stock price and then sold their own shares at a profit. See id. at 307-08.

The circuit courts of appeals are currently split on the question of whether plaintiffs may still use "motive and opportunity" pleadings to demonstrate scienter under the heightened pleading requirements set forth in the PSLRA. Two circuits have held that evidence of motive and opportunity to commit securities fraud may still satisfy the requirements for pleading scienter under the PSLRA. See Press, 166 F.3d at 537-38 (upholding previous Second Circuit standard without analysis of the PSLRA); Advanta, 180 F.3d at 534-35 (analyzing the PSLRA and upholding Second Circuit standard). At least one circuit has held that

motive and opportunity pleadings alone can never satisfy the scienter pleading requirements of the PSLRA. See In re Silicon Graphics, 183 F.3d at 979. And at least two, and arguably three, more circuits have adopted a middle ground between these two approaches, holding that motive and opportunity pleadings are relevant to a finding of scienter, but that they do not constitute a separate, alternative method of pleading scienter. See Greebel, 194 F.3d at 197; Helwig, 251 F.3d at 550-51; Bryant, 187 F.3d at 1285-86; see also In re Comshare Inc. Sec. Litig., 183 F.3d 542, 550-51 (6th Cir. 1999).

We agree with the middle ground chosen by the First and Sixth Circuits, and arguably by the Eleventh Circuit.[19] These circuits have determined that courts must look to the totality of the pleadings to determine whether the plaintiffs' allegations permit a strong inference of fraudulent intent. Allegations

_____

[19] We say "arguably" because the Eleventh Circuit opinion, Bryant, 187 F.3d 1271, is internally inconsistent in this regard. On the one hand, Bryant clearly states, "the statutory language [of the PSLRA] – 'required state of mind' – plainly does not refer to motive and opportunity, because motive and opportunity do not constitute a state of mind. Thus, we conclude that the Reform Act did not codify the motive and opportunity analysis." Id. at 1286. On the other hand, Bryant also states: "While allegations of motive and opportunity may be relevant to a showing of severe recklessness, we hold that such allegations, without more, are not sufficient to demonstrate the requisite scienter in our Circuit." Id. at 1285-86. The analysis in Bryant, which relied heavily on the Sixth Circuit's opinion in In re Comshare, Inc. Sec. Litig., 183 F.3d 542 (6th Cir. 1999), was later criticized by the Sixth Circuit in Helwig, 251 F.3d at 550.

of motive and opportunity may be important to that totality, but are typically not sufficient in themselves to establish a "strong inference" of scienter.

In Greebel, for example, the First Circuit acknowledged that the PSLRA heightened the pleading requirements for scienter to require particularized and specific references to each alleged misrepresentation or omission, and to require that plaintiffs present factual allegations supporting a "strong inference," 194 F.3d at 197, "that adverse circumstances existed at the time of the offering, and were known and deliberately or recklessly disregarded by defendants," id. at 193-94. The Greebel court then stated:

> Our view of the Act is thus close to that articulated by the Sixth Circuit. That court held that a plaintiff could survive a motion to dismiss "by pleading facts that give rise to a strong inference of [scienter]." In re Comshare, Inc. Sec. Litig., 183 F.3d 542, 550 (6th Cir. 1999) (internal quotation marks omitted). The Sixth Circuit found that evidence of motive and opportunity to commit fraud did not, of itself, constitute scienter for purposes of section 10(b) and Rule 10b-5. See id. at 551. "Indeed, those courts addressing motive and opportunity in Securities Act cases have held only that facts showing a motive and opportunity may adequately allege scienter, not that the existence of motive and opportunity may support, as scienter itself, liability under § 10b or Rule 10b-5." Id. The court held that evidence of motive and opportunity was "relevant" to pleading facts that could establish scienter, and, on occasion, could "rise to the level of creating a strong inference of reckless or knowing conduct." Id. Nevertheless, such evidence, standing alone, could not "constitute the pleading of a strong inference of scienter." Id.; accord Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1282-83 (11th Cir. 1999).

Greebel, 194 F.3d at 197.

In Helwig, the most recent circuit court opinion on the issue, the en banc

Sixth Circuit stated:

> While it is true that motive and opportunity are not substitutes for a showing of recklessness, they can be catalysts to fraud and so serve as external markers to the required state of mind. Comshare made this distinction by refusing to equate motive and opportunity with scienter but yet recognizing that facts showing each may support a strong inference of recklessness. We reaffirm that plaintiffs cannot simply plead "motive and opportunity" as a mantra for recovery under the Reform Act. The Act requires plaintiffs to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which the belief is formed." 15 U.S.C. § 78u-4(b)(1). In this wash of allegations, "motive" and "opportunity" are simply recurring patterns of evidence. We decide cases on facts, not labels. Whether the facts can be said to establish motive, opportunity, or neither, we are directed only to consider whether they produce a strong inference that the defendant acted at least recklessly. This necessarily involves a sifting of allegations in the complaint. As we have noted, recklessness in securities fraud is an untidy, case-by-case concept. Accordingly, facts presenting motive and opportunity may be of enough weight to state a claim under the PSLRA, whereas pleading conclusory labels of motive and opportunity will not suffice.

251 F.3d at 550-51 (some citations omitted). The Sixth Circuit further concluded

that this type of fact-specific inquiry, which is bound not by labels or magic

words but by the totality of the facts presented in the complaint, "best reflects the

intent of Congress [in passing the PSLRA, because] . . . Congress was concerned

with the quantum, not type, of proof." Id. at 551.

- 33 -

We believe the most reasonable reading of the PSLRA in regard to motive and opportunity pleadings is the view adopted by the First Circuit in Greebel and the Sixth Circuit in Helwig. The PSLRA was obviously intended to eliminate frivolous securities litigation through its heightened scienter pleading requirements. Allegations of motive and opportunity, with nothing more, could allow potentially frivolous lawsuits to go forward with only minimal allegations of scienter. But evidence of motive and opportunity may be relevant to a finding of scienter, and thus may be considered as part of the mix of information that can come together to create the "strong inference" of scienter required by the PSLRA. When reviewing a plaintiff's allegations of scienter under the PSLRA, a court should therefore examine the plaintiff's allegations in their entirety, without regard to whether those allegations fall into defined, formalistic categories such as "motive and opportunity," and determine whether the plaintiffs' allegations, taken as a whole, give rise to a strong inference of scienter.

2) <u>Plaintiffs' Allegations Fail to Raise a Strong Inference of Scienter as Required by the PSLRA</u>

Reviewing Plaintiffs' complaint under the standards set forth above, we conclude that Plaintiffs have not sufficiently and with particularity pled facts giving rise to a "strong inference" that Defendants engaged in either knowing or

reckless misconduct when they failed to disclose the David's Litigation prior to March 14, 1996.

First, Plaintiffs argue that the individual Defendants should be charged with knowledge of the materiality of the David's Litigation because all four occupied senior positions at Fleming both prior to and during the class period. In regard to Defendants Devening and Twomey, Plaintiffs have provided no particular facts from which this court could plausibly infer their knowledge of the David's Litigation, the underlying business practices at issue in that case, or the potential materiality of the lawsuit. And even with regard to Defendants Stauth and Eyler, who either submitted affidavits or were deposed in the David's Litigation, Plaintiffs rest primarily on conclusory allegations that these men occupied senior positions in the company, knew of the David's Litigation no later than early 1995, and were aware of their general obligation to disclose pending material litigation. As the Third Circuit noted in <u>Advanta</u>, 180 F.3d at 539, "allegations that a securities fraud defendant, because of his position within the company, 'must have known' a statement was false or misleading are 'precisely the types of inferences which [courts], on numerous occasions, have determined to be inadequate to withstand Rule 9(b) scrutiny.' Generalized imputations of knowledge do not suffice, regardless of defendants' positions within the company." (quoting <u>Maldonado v. Dominguez</u>, 137 F.3d 1, 10 (1st Cir. 1998).

Thus, the mere fact that the individual Defendants occupied senior positions in the company, and that two of them knew of the litigation at least by early 1995, is not sufficient to imply knowledge of the specific fact of materiality. Plaintiffs' conclusory allegations both that Defendants Devening and Twomey "had actual knowledge of the David's litigation or [were] recklessly indifferent to it" and that they were actually aware or recklessly indifferent to the "fraudulent" business practices underlying the litigation are completely unsupported by any particularized facts that might give rise to a strong inference that they acted with scienter in failing to disclose the David's Litigation. Similarly, in regard to Defendants Stauth and Eyler, Plaintiffs' allegations that they knew of the litigation no later than early 1995 and were aware of their duty to disclose pending material litigation are exactly the type of conclusory assertions of liability that the PSLRA was designed to prevent. Finally, even if we were to accept as true Plaintiffs' unsupported statements that all the individual Defendants, by virtue of their positions and responsibilities within the company, "must have known" both about the David's Litigation and about the "fraudulent" business practices forming the basis of that lawsuit, the important issue in this case is <u>not</u> whether Defendants knew the underlying facts, but whether Defendants knew that not disclosing the David's Litigation posed substantial likelihood of misleading a reasonable investor. See <u>Schlifke</u>, 866 F.2d at 946

("[I]t is the <u>danger of misleading buyers</u> that must be actually known or so obvious that any reasonable man would be legally bound as knowing."); <u>cf.</u> <u>Sundstrand Corp. v. Sun Chem. Corp.</u>, 553 F.2d 1033, 1045 (7th Cir. 1977) ("[the] danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it . . . ."). None of Plaintiffs' allegations regarding Defendants' positions in the company and awareness of their general obligation to disclose material pending litigation establish a strong inference that Defendants knew the David's Litigation was material and thus that buyers would be misled if the lawsuit was not explicitly disclosed.

Second, Plaintiffs argue that Defendants must have actually known or recklessly disregarded the importance of the David's Litigation to potential and current investors because of the large damages claim in that lawsuit and because the lawsuit challenged a widespread company policy which, if the lawsuit were successful, could have generated additional similar lawsuits. According to the complaint, at the time the David's Litigation was filed in August 1993, the damages claim of $ 110 million represented approximately 3.5% of Fleming's total assets. Throughout 1994 and early 1995, the damages claim represented approximately 2.4% of Fleming's total assets. After that point in time, the David's Litigation complaint was amended to include even higher damages claims

of approximately $ 250 million on or about September 19, 1995, and of

$ 445,101,000 on or about February 9, 1996.  Plaintiffs have provided no

financial data for Fleming during the 1995 fiscal year, however, so we do not

know what percentage of Fleming's assets the revised damages claims represented

at the time of amendment.  Plaintiffs also ask that we consider, when evaluating

the extent of Defendants' alleged recklessness in this case, the total potential

liability to Fleming if it lost the David's Litigation and Fleming's other "cost-

plus" customers subsequently decided to file similar lawsuits.  Plaintiffs did not,

however, plead specifics of other lawsuits to which Fleming could have been

subjected after an adverse verdict in the David's Litigation.[20]

The standard for recklessness in the securities context, as discussed above,

is "conduct which is highly unreasonable and which represents an extreme

departure from the standards of ordinary care . . . to the extent that the danger was

either known to the defendant or so obvious that the defendant must have been

aware of it."  Novak, 216 F.3d at 308.  We cannot conclude from Plaintiffs'

complaint that the potential negative impact of the David's Litigation was "so

---

[20]  Although Plaintiffs assert that three of Fleming's other "cost-plus" customers have filed lawsuits against the company, those lawsuits were filed only after the $ 200 million verdict in the David's Litigation was announced and disclosed by Fleming.  Further, Plaintiffs have not pled the damages amounts claimed in the three other copycat lawsuits filed against Fleming by its "cost-plus" customers.

obvious that the defendant[s] must have been aware" both of the potential impact and that failure to disclose it posed an obvious danger of misleading buyers that Defendants recklessly ignored.

Assuming Defendants actually knew about the David's Litigation, a fact which Plaintiffs have not pled with particularity except in regard to Stauth and Eyler and then only in regard to early 1995 onward, the question of whether Defendants recklessly failed to disclose the David's Litigation is, of course, intimately bound up with whether Defendants either actually knew or recklessly ignored that the David's Litigation was material and nevertheless failed to disclose it. "In evaluating the materiality of an event that is 'contingent or speculative in nature,' [Basic, Inc. v. Levinson, 485 U.S. 224 (1988)] provides that 'materiality "will depend at any given time upon a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity."'" SEC v. Fehn, 97 F.3d 1276, 1291 (9th Cir. 1996) (citing Basic, 485 U.S. at 238 (quoting SEC v. Texas Gulf Sulphur Co., 401 F.2d 833 (2d Cir. 1968) (en banc))). Further, "[a] statement or omission is only material if a reasonable investor would consider it important in determining whether to buy or sell stock," and if it would have "significantly altered the total mix of information available" to current and potential investors. See Grossman, 120 F.3d at 1119.

Other than reciting the contents of a few internal memoranda generally referencing inflated prices and customer complaints, Plaintiffs have alleged no particular facts on which this court could conclude that Defendants "must" have known the David's Litigation was meritorious, or that the damage award would be substantial, at the time Defendants decided not to explicitly disclose the lawsuits in its SEC filings and Annual Reports. Plaintiffs' general, conclusory assertions to the contrary are not sufficient to satisfy the PSLRA's requirement of particularized facts.

Assuming for the sake of argument, however, that Defendants knew they might lose the David's Litigation, we cannot say at this juncture that the "likelihood of [the] potential event," i.e., having a large money judgment entered against the company, was so significant that Defendants were reckless in not disclosing the litigation. For guidance on this question, we look to 17 C.F.R. § 229.103, which requires companies to report pending litigation meeting certain criteria relating to materiality. The regulation states:

> Describe briefly any material pending legal proceedings, other than ordinary routine litigation incidental to the business, to which the registrant or any of its subsidiaries is a party or of which any of their property is the subject. Include the name of the court or agency in which the proceedings are pending, the date instituted, the principal parties thereto, a description of the factual basis alleged to underlie the proceeding and the relief sought.

17 C.F.R. § 229.103. Instruction number 2 to this regulation states: "No information need be given with respect to any proceeding that involves primarily a claim for damages if the amount involved, exclusive of interest and costs, does not exceed 10 percent of the current assets of the registrant and its subsidiaries on a consolidated basis." See 17 C.F.R. § 229.103, Instruction 2 (emphasis added). Assuming without deciding that the David's Litigation was not "ordinary routine litigation incidental to the business," Plaintiffs fail to allege that Fleming was required by federal regulation to disclose the David's Litigation because the initial damages claim exceeded the 10% of current assets materiality threshold of § 229.103. Indeed, Plaintiffs have provided no information whatsoever regarding Fleming's current assets at the time the David's Litigation commenced. And while the damages claims in the David's Litigation were significantly increased in September 1995 and February 1996, Plaintiffs have not pled facts establishing that the individual Defendants were actually aware that the damages figures had been amended, nor have they included in their complaint any financial data from which we could calculate the percentage of Fleming's current assets that the increased claims represented at the time of amendment. Further, the first amended damages claim ($ 250 million) existed for only the last 6 months of the 28-month class period, and the second amended damages claim ($ 445,101,000) existed for only the last month of the 28-month class period; once the final

damages claim of $ 445,101,000 was asserted in the David's Litigation, Defendants explicitly disclosed the David's Litigation in Fleming's very next public disclosure filing, the 1995 Annual Report.

For these reasons, we could not impute knowledge of the higher damages claims to Defendants for the majority of the class period, and, in any event, we could not determine the potential materiality under § 229.103 of the David's Litigation because Plaintiffs have not provided the financial information necessary to make that determination. Using § 229.103 as a guidepost, cf. General Elec. Co. v. Cathcart, 980 F.2d 927, 937 (3d Cir. 1992) ("Although not determinative, Schedule 14A is persuasive authority as to the required scope of disclosure in proxy materials, as the regulation provides 'us with the [SEC's] expert view of the types of involvement in legal proceedings that are most likely to be matters of concern to shareholders in a proxy contest.'" (quoting GAF Corp. v. Heyman, 724 F.2d 727, 739 (2d Cir.1983)); TSC Indus., Inc. v. Northway, 426 U.S. 438, 449 n.10 ("[T]he SEC's view of the proper balance between the need to insure adequate disclosure and the need to avoid the adverse consequences of setting too low a threshold for civil liability is entitled to consideration."), we cannot conclude that Plaintiffs have alleged adequately that Defendants were reckless in failing to disclose the David's Litigation prior to March 14, 1996.

It is true that Instruction 2 to § 229.103 further states: "[I]f any proceeding presents in large degree the same legal and factual issues as other proceedings pending or known to be contemplated, the amount involved in such other proceedings shall be included in computing such [10%] percentage." 17 C.F.R. § 229.103, Instruction 2. Plaintiffs assert that, when considering the potential liability in the David's Litigation, Defendants should have considered the possibility of other lawsuits being filed against the company alleging substantially the same claims and, in failing to do so, Defendants recklessly ignored an obvious risk to the company. Instruction Two does not compel such a finding, however. Plaintiffs have given us no specifics with which to weigh the possibility of additional lawsuits being filed following a potential adverse verdict in the David's Litigation. For example, we do not know how many Fleming customers had entered into "cost-plus" contracts with the company, the approximate volume of business in which Fleming's other "cost-plus" customers engaged under those contracts, or the amount of damages that might have been claimed in any other potential lawsuits against Fleming. More important, Plaintiffs have not alleged that any additional lawsuits were, in fact, "pending or known to be contemplated," and thus they have alleged no reason why Defendants should have aggregated potential risks when deciding whether to disclose the David's Litigation under § 229.103. "Wide authority establishes that while pending litigation may be

- 43 -

material under certain circumstances, the mere possibility of litigation is not." Cathcart, 980 F.2d at 935; see also, e.g., Prettner v. Aston, 339 F. Supp. 273, 287 (D. Del. 1972) (any statement regarding "the possibility of" litigation other than a pending or threatened legal proceeding "would have been wholly speculative and was not required"). But cf. Fehn, 97 F.3d at 1291 (finding defendant liable for not disclosing past securities law violations, even where no lawsuits had yet been filed based upon those violations, because those violations could have spawned lawsuits that would have "represented a potentially large financial loss" for the company). We therefore conclude that Defendants cannot be held responsible for the failure to consider the cumulative effect of other, similar lawsuits that had not been filed and, as far as the pleadings establish, were not even threatened, at the time Defendants decided not to disclose the David's Litigation.

Plaintiffs correctly argue that it is possible for securities fraud defendants to comply technically with SEC reporting requirements such as § 229.103 and yet still be omitting information that is material and should therefore be disclosed. Cf. Zell v. Intercapital Income Sec., Inc., 675 F.2d 1041, 1044 (9th Cir. 1982) (noting that the defendant's compliance with the technical requirements of Schedule 14A in drafting its proxy statement did not necessarily mean that a "proxy statement satisfies" the materiality test set forth by the Supreme Court in TSC Indus., Inc. v. Northway, 426 U.S. 438 (1976)). In TSC, the Supreme Court

stated that an "omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote."  426 U.S. at 449 (addressing materiality in the context of proxy statements); see also Grossman, 120 F.3d at 1119 ("[A] statement or omission is only material if a reasonable investor would consider it important in determining whether to buy or sell stock," and if it would have "significantly altered the total mix of information available" to current and potential investors).  The existence of the David's Litigation might have been deemed important by a reasonable investor, but we cannot conclude that this possibility was "either known to [Defendants] or . . . so obvious that [Defendants] must have been aware of it."  Anixter, 77 F.3d at 1232. While the damages claims were certainly substantial, for the majority of the class period the damages claims totaled only 2.4%-3.5% of Fleming's total assets and approximately 10% of Fleming's total net worth.  Because damages claims are often inflated by plaintiffs overestimating their chances of success at trial or hoping to force a settlement, we cannot find Defendants liable under the Act for failing to anticipate the full extent of their potential exposure in the David's Litigation.  Finally, within one month from the time the damages claim was amended to $ 445,101,000, Defendants disclosed the litigation, stating: "Management is unable to predict a potential range of monetary exposure, if any, to the company, but believes the claims asserted are without merit and that a

material adverse effect of the company's consolidated financial position is less than probable. However, based upon the large recovery sought, an unfavorable result could have a material adverse effect on the company." (See Complaint ¶ 40, Pl. App. at 179-80.) Under these circumstances, Plaintiffs have not alleged that Defendants engaged in conduct constituting "an extreme departure from the standards of ordinary care" or recklessly ignored "a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." Anixter, 77 F.3d at 1232 (quotation marks omitted).

Our inquiry does not end there, however, because Plaintiffs also pled five possible motives for Defendants' conduct: (1) to facilitate notes offerings on December 8, 1994; (2) to avoid jeopardizing the success of the FFMP; (3) to minimize the possibility of future lawsuits alleging similar claims; (4) to "protect and enhance their executive positions and the substantial compensation and prestige they obtained thereby;" and (5) to enhance the value of their own Fleming stock. Because we have concluded that allegations of motive and opportunity are relevant to securities fraud plaintiffs' allegations of scienter, we now review Plaintiffs' allegations of motive to determine whether the allegations of scienter, taken as a whole, are sufficient under the PSLRA.

The only alleged motive that arguably supports Plaintiffs' scienter allegations is alleged motive (2), that Defendants failed to disclose the David's

Litigation because they feared jeopardizing the FFMP. While the desire not to jeopardize a company's business plan is a motive shared by most companies and thus would not ordinarily support an inference of fraudulent intent, see, e.g., Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1130 (2d Cir. 1994), this alleged motive for Defendants' non-disclosure of the David's Litigation is specifically and directly related to the underlying facts of the David's Litigation and is therefore at least somewhat probative of Defendants' motivations in this case.

Specifically, Plaintiffs alleged that Fleming started the FFMP because, by late 1993, "it was apparent to Fleming that changes in the way grocery manufacturers conducted business were eliminating . . . many of the opportunities for discount buying that had made Fleming's" pricing practices so profitable. According to Plaintiffs, Fleming responded to these changes by creating the FFMP, which sought to convert all of Fleming's customers to "cost-plus" contracts. Acceptance of the FFMP, which depended on customers believing that Fleming would actually pass through all discounts to its customers, was therefore important to Fleming's continued profitability. Plaintiffs assert that, because Defendants feared undermining the success of the FFMP by highlighting to potential customers Fleming's alleged past failure to pass through discounts to its "cost-plus" customers, Defendants deliberately failed to disclose the David's Litigation.

While we find this alleged motive relevant to a finding of scienter, it does not, even when viewed in the context of Plaintiffs' other allegations, ultimately convince us that Plaintiffs' scienter allegations are sufficient to satisfy the PSLRA. Plaintiffs' allegations fail to state with particularity that Defendants were aware of the David's Litigation throughout the class period (or, indeed, at any point prior to early 1995), aware of the amended damages claims which greatly increased Fleming's potential liability in the case, or aware that any other lawsuits might result from Fleming's alleged failure previously to pass through all discounts to its customers. Furthermore, Plaintiffs' allegations establish that, as early as 1989, Fleming's customers were aware that Fleming was not passing through certain discounts (such as cash discounts and discounts for forward-buying). Given the alleged history of customer complaints on this issue, it seems Fleming had little reason to fear that publication of one more customer's complaint, in the form of the David's Litigation, would likely result in substantial injury to the success of the FFMP. Under these circumstances, and viewing this allegation of motive in context of the entire pleadings in this case, we do not find that Fleming's desire for the FFMP to succeed was a sufficient motive for Defendants intentionally to fail to disclose the David's Litigation in a manner evidencing recklessness or intent to defraud.

The remaining alleged motives, which are generalized motives shared by all companies and which are not specifically and uniquely related to Fleming in particular, are unavailing. Alleged motive (1), that Defendants failed to disclose the David's Litigation in order to facilitate the notes offering in December 1994, is the epitome of a shared business motive and thus cannot by itself sustain a claim of securities fraud. As one court has stated: "We do not agree that a company's desire to maintain a high bond or credit rating qualifies as a sufficient motive for fraud in these circumstances, because if scienter could be pleaded on that basis alone, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions." San Leandro Emergency Med. Group Profit Sharing Plan v. Phillip Morris Co., Inc., 75 F.3d 801, 814 (2d Cir. 1996) (quotations and citations omitted); see also, e.g., Novak v. Kasaks, 997 F. Supp. 425, 430 n.5 (S.D.N.Y. 1998) (alleged motive to raise capital insufficient as a matter of law to allege scienter). Further, the desire to decrease the number of potential lawsuits against Fleming by its customers is another shared business motive. Cf. In re Crystal Brands Sec. Litig., 862 F. Supp. 745, 749 (D. Conn. 1994) (protection of customer relations is a shared business motive). Accordingly, alleged motive (3) is not particularly helpful in establishing that Defendants engaged in intentional or reckless conduct when failing to disclose the David's Litigation. Finally, alleged motives (4) and (5),

that Defendants desired to protect their own positions with the company and the value of their own Fleming stock, are also insufficient, as again they are motives shared by all company executives. See Novak, 216 F.3d at 307 (stating that allegations of motive are insufficient where plaintiff pled only that the Defendants "desire[d] to maintain a high stock price in order to increase executive compensation or prolong the benefits of holding corporate office") (quotations and citations omitted). As the Fourth Circuit explained in Phillips v. LCI Int'l, Inc., 190 F.3d 609 (4th Cir. 1999):

> Allegations that "merely charge that executives aim to prolong the benefits they hold" are, standing alone, insufficient to demonstrate the necessary strong inference of scienter. For this reason assertions that a corporate officer or director committed fraud in order to retain an executive position . . . simply do not, in themselves, adequately plead motive. Similarly insufficient are allegations that corporate officers "were motivated to defraud the public because an inflated stock price would increase their compensation." To support a claim of motive based on the benefit a defendant derives from an increase in the value of his holdings, a plaintiff must demonstrate some sale of "personally-held stock" or "insider trading" by the defendant.

190 F.3d at 622 (citations omitted) (citing inter alia Shields, 25 F.3d at 1130; Acito v. IMCERA Group, Inc., 47 F.3d 47, 54 (2d Cir. 1995); Melder v. Morris, 27 F.3d 1097, 1102 (5th Cir. 1994)). Here, Plaintiffs do not plead facts giving rise to an inference that Defendants "misrepresented to the public material facts about the corporations's performance or prospects in order to keep the stock price artificially high while they sold their own shares at a profit." Novak, 216 F.3d at

- 50 -

307. To the contrary, Plaintiffs make no concrete allegations that any of the Defendants sold Fleming stock at an inappropriately inflated price, or that they in any other way benefitted in some concrete and personal manner from making the alleged misrepresentations and/or omissions. For these reasons, we find that Plaintiffs' alleged motives (4) and (5) are insufficient to raise a "strong inference" of scienter.

Even when reviewing Plaintiffs' allegations as a whole, considering both Plaintiffs' direct allegations of scienter and Plaintiffs' allegations of motive and opportunity, we cannot conclude that Plaintiffs have "state[d] with particularity facts giving rise to a strong inference that [Defendants] acted with the required state of mind," as required under the PSLRA.

3) The District Court Properly Dismissed Plaintiffs' Claims of Controlling Person Liability

Plaintiffs' claims of controlling person liability were dismissed based upon the district court's dismissal of Plaintiffs' primary claim that Defendants violated § 10(b) of the Exchange Act and Rule 10b-5. (See City of Philadelphia v. Fleming Co., No. CIV-96-853-M, slip op. at 17 (W.D. Okla. Feb. 4, 2000) (unpublished order) (Pl. App. at 225)). The controlling person liability claims were brought pursuant to section 20(a) of the Act, 15 U.S.C. § 78t, which states:

Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). "[T]o state a prima facie case of control person liability, the plaintiff must establish (1) a primary violation of the securities laws and (2) 'control' over the primary violator by the alleged controlling person." Maher v. Durango Metals, Inc., 144 F.3d 1302, 1305 (10th Cir. 1998). Because we find that the district court properly dismissed Plaintiffs' claims relating to primary violations of the Act, we conclude that Plaintiffs' controlling person liability claims were properly dismissed, as well. See First Interstate Bank of Denver v. Pring, 969 F.2d 891, 897 (10th Cir. 1992), rev'd on other grounds sub nom., Central Bank of Denver v. First Interstate Bank, 511 U.S. 164 (1994).

## CONCLUSION

For the foregoing reasons, we AFFIRM the district court's dismissal of Plaintiffs' complaint.