**Domenico PIRRAGLIA, on behalf of himself and all others similarly situated, Plaintiffs**

v.

**NOVELL, INC.; Joseph Marengi; James Tolonen; John Young; Ernst & Young Defendants.**

**No. 2:99CV995C.**

United States District Court, D. Utah, Central Division.

April 16, 2002.

Richard D. Burbidge, Stephen B. Mitchell, Jason D. Boren, Jefferson W. Gross, Burbidge & Mitchell, Salt Lake City, UT, Henry Rosen, Kimberly C. Epstein, Milberg Weiss Bershad Hynes & Lerach, San Diego, CA, Frederic S. Fox, Kaplan Kilsheimer & Fox, New York City, Laurence D. King, Kaplan Fox & Kilsheimer, San Francisco, CA, Patrick J. Coughlin, Susan K. Alexander, Milberg Weiss Bershad Hynes & Lerach, San Francisco, CA, for Plaintiffs.

Brian J. Romriell, Jeffrey J. Hunt, Parr Waddoups Brown Gee & Loveless, Salt Lake City, UT, Terry T. Johnson, Aileen Arrieta, Kent W. Easter, Daniel W. Turbow, Peri Erlanger, Wilson Sonsini Goodrich & Rosati, Palo Alto, CA, for Defendants.

## AMENDED ORDER

CAMPBELL, District Judge.

This is an amended order to the April 5, 2002 order. This is a securities class action suit brought by stockholders of Novell, Inc. against Novell and certain Novell directors.[1] Plaintiffs allege that between November 1, 1996 and April 22, 1997 ("the Class Period"), Defendants issued materially false financial statements and other public statements concerning Novell's business performance and prospects, in violation of: (1) § 10 of the Securities and Exchange Act of 1934 ("the 1934 Act"), 15 U.S.C. § 78j(b): and Rule 10b–5 thereunder, 17 C.F.R. § 240.10b–5[2] and (2) § 20 of the 1934 Act.[3]

This action comes before the court on Defendants' motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) on the ground that Plaintiffs' second amended and consolidated complaint fails to state a claim. The court previously dismissed the Plaintiffs' complaint without prejudice on the ground that it failed to comply with the heightened pleading standards under Private Securities Litigation Reform Act ("Reform Act"). As discussed below, because the second amended and consolidated complaint lacks particularity and fails to allege the requisite scienter on the part of the Defendants, Defendants' motion is GRANTED.

1. The individual Defendants are:
 a. *John Young:* prior to August 1996—director of Novell and a member of its Audit Committee; after August 1996—Chairman of the Board and Novell's interim CEO;
 b. *Joseph Marengi:* Novell Executive Vice–President–Worldwide Sales and President and CEO of the Company during the Class Period (until May 1997);
 c. *James Tolonen:* Executive Vice–President and CFO of Novell;

2. Section 10(b) makes it unlawful for any person:
 > [t]o use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.
 > 15 U.S.C. § 78j(b). Rule 10b–5 declares it unlawful for a person:
 > to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.
 > 17 C.F.R. § 240.10b–5.

3. Section 20 states, in pertinent part, that:
 > [e]very person who, directly or indirectly controls any person liable under any provision of this chapter ... shall also be liable jointly and severally with and to the same extent as such controlled person....
 > 15 U.S.C. § 78t(a).

## Discussion

### A. Standard of Review

For purposes of a 12(b)(6) motion, the court generally confines itself to the text of the complaint and accepts all well-plead facts as true. *Schwartz v. Celestial Seasonings, Inc.*, 124 F.3d 1246, 1251 (10th Cir.1997). Dismissal pursuant to Rule 12(b)(6) is appropriate only when it appears that plaintiffs can prove no set of facts in support of the claims asserted. *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1118 (10th Cir.1997).

In the securities fraud context, a plaintiff is held to a strict standard of pleading. *Id.* at 1124. Traditionally, plaintiffs alleging securities fraud had to meet the heightened pleading requirement of Rule 9(b). Under Rule 9(b), a plaintiff is required to "set forth what is false or misleading about a statement, and why it is false. In other words, the plaintiff must set forth an explanation as to why the statement or omission complained of was false or misleading." *Id.*

In 1995, Congress passed the Private Securities Litigation Reform Act in an effort to heighten Rule 9(b)'s pleading standards. "The Reform Act imposes even more rigorous pleading requirements on plaintiffs alleging fraud in the securities context." *Karacand v. Edwards*, 53 F.Supp.2d 1236, 1242 (D.Utah 1999); *see also In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 983–84 (9th Cir.1999); *Caprin v. Simon Transp. Servs.*, 112 F.Supp.2d 1251, 1255 (D.Utah 2000); *Schaffer v. Evolving Sys., Inc.*, 29 F.Supp.2d 1213, 1219 (D.Colo.1998) ("[t]he Reform Act substantially modified, among other things, the standard for pleading securities fraud claims").

After the Reform Act, a securities complaint must first "specify each statement alleged to have been misleading" as well as "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u–4(b)(1);

see also *Karacand*, 53 F.Supp.2d at 1242; *Caprin*, 112 F.Supp.2d at 1255. "Mere conclusory allegations of falsity are insufficient." *Grossman*, 120 F.3d at 1124.

Second, and of particular significance here, a "complaint shall, ... state with particularity facts giving rise to a strong inference that the defendant[s] acted with the required state of mind" and must do so with respect to each act or omission alleged to be a violation of the securities laws. 15 U.S.C. § 78u–4(b)(2); *see also Karacand*, 53 F.Supp.2d at 1242; *Caprin*, 112 F.Supp.2d at 1255. To establish that a defendant acted with the requisite state of mind, or scienter, a plaintiff must demonstrate that: "(1) the defendant knew of the potentially material fact, and [that] (2) the defendant knew that failure to reveal the potentially material fact would likely mislead investors." *City of Philadelphia v. Fleming Cos., Inc.*, 264 F.3d 1245, 1261 (10th Cir.2001). Recklessness can satisfy the scienter requirement under § 10(b). *Id.* But scienter may not be pled through "fraud by hindsight" because corporate officials are liable only for failing to reveal "those material facts reasonably available to them." *Id.* However, "evidence of motive and opportunity may be relevant to a finding of scienter, and thus may be considered as part of the mix of information that can come together to create the 'strong inference' of scienter...." *Id.* at 1263. Therefore, "[w]hen reviewing a plaintiff's allegations of scienter [the court should] examine the plaintiff's [sic] allegations in their entirety, without regard to whether those allegations fall into defined, formalistic categories such as 'motive and opportunity,' and determine whether the plaintiffs' allegations, taken as a whole, give rise to a strong inference of scienter." *Id.*

Finally, for allegations made on information and belief, the complaint "shall state

with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1); *see also Karacand,* 53 F.Supp.2d at 1242; *Caprin,* 112 F.Supp.2d at 1255. "The Reform Act mandates dismissal, upon motion of the defendant, if the complaint fails to meet these requirements." *Karacand,* 53 F.Supp.2d at 1242; *see also* 15 U.S.C. § 78u–4(b)(3)(A).

**B.** *Section 10(b) Claim*

To state a claim under § 10(b) of the Act of 1934, a plaintiff must allege:

(1) a misleading statement or omission of a material fact; (2) made in connection with the purchase or sale of securities; (3) with intent to defraud or recklessness; (4) reliance; and (5) damages.

*Grossman,* 120 F.3d at 1118; *see also Karacand,* 53 F.Supp.2d at 1242.

**1.** *Fraudulent Representations of Positive Company Forecast*

Plaintiffs allege that every positive statement Defendants made about Novell was false and misleading and made with the intent to defraud. (*See generally* Sec. Am. & Consol. Compl. ¶¶ 37–77). Specifically, Plaintiffs identify three types of positive misstatements by Defendants: (1) statements that "Novell had achieved its strong 4Q[4] sales **without engaging in any special promotional pricing, discounting or other unusual inducements to distributors to accept product.**" (*Id.* ¶ 37) (bolding in the original); (2) statements that Novell had cleaned out its channel inventory (*See e.g. id.* ¶ ¶ 47, 64); and (3) general statements about positive demand for new products and the financial security of Novell.[5] (*See e.g. id.* ¶ ¶ 55, 72). According to Defendants, these alle-

gations are not actionable for several reasons: (a) Plaintiffs' conclusory references to unspecified product problems and product demand issues are not detailed and fail to provide facts showing that the statements were false; (b) Plaintiffs fail to sufficiently allege that Defendants knew the alleged statements were false (scienter); (c) Plaintiffs fail to establish materiality; (d) Defendant Young's two statements regarding Novell's financial health were mere puffery rather than materially false statements. (*See* Defs.' Memo. in Supp. of Mot. to Dismiss at 16–22).

**a.** *Failure to Adequately Show that Novell's Statements Were False When Made*

■ At the base of a securities claim is the requirement that Plaintiffs allege Defendants made a misleading statement or omission of a material fact. *See Karacand,* 53 F.Supp.2d at 1242. Here, however, Plaintiffs have failed to give the source or factual basis for the argument that Defendants' statements were false when they were made. Rather than plead facts, Plaintiffs merely assert that Novell's alleged positive statements about product demand, promotional pricing, and channel inventory maintenance were false because the opposite was true. Two examples help shed light on the insufficiency of this argument. First, Plaintiffs do not make any *particularized* allegations concerning: the amount of inventory in the channel at any time; explanations of how they determined that there was an excess inventory; who received the reports, or when the reports were issued. (*See generally* Sec. Am. & Consol. Compl. ¶¶ 85–86, 92, 94, 96, 98,

---

**4.** The parties use shorthand for each financial quarter. For example, the First Quarter of 1996 is referred to as 1Q F96.

**5.** The parties disagree on Defendants' liability for statements made by third-parties. Be-

cause the second amended and consolidated complaint fails to state a claim of securities fraud even if the court assumes Defendants are liable for third-party statements, this issue need not be resolved.

100–101). Such specificity is required under the heightened pleading burdens of the Reform Act. *See In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d at 985 ("We would expect that a proper complaint which purports to rely on the existence of internal reports would contain at least some specifics from those reports as well as such facts as may indicate their reliability.").

As a second example, Plaintiffs allege that Novell knew "end-users were unenthusiastic" about Novell's products. (Sec. Am. & Consol. Compl. ¶ 55). Again, Plaintiffs' allegations fail to show how Novell knew the demand for its products was poor or how severe the demand problems were. As Defendants correctly observe:

> plaintiffs again are missing the critical piece of the puzzle: specific facts indicating that the supposed demand problems actually existed. Plaintiffs must plead facts showing specifically *what* Novell knew, how it affected the forecast, and *how* and *when* defendants knew it. Like the last Complaint, this Complaint lacks such allegations and should be dismissed.

(Defs' Mem in Supp. at 17) (emphasis in the original). In essence, Plaintiffs' have not provided the requisite basis for their factual allegations. Plaintiffs failed to adequately allege that the reports were in fact deficient, but have also not plead which Defendants falsely use the information in those reports, and, as discussed below, Plaintiffs do not adequately allege that the Defendants knew that the forecasts were faulty. *See In re Silicon*, 183 F.3d at 985 (complaint based on negative internal reports dismissed where allegations lacked details of reports, such as how plaintiffs learned of them and who drafted them); *Karacand*, 53 F.Supp.2d at 1248 (dismissing allegations without contemporaneous statement or document indicating why alleged product problems were serious or

could not be remedied); *Plevy v. Haggerty*, 38 F.Supp.2d 816, 826 (C.D.Cal.1998) (dismissing allegations that products were riddled with technical problems or fatally flawed).

#### b. Failure to Show Scienter

As stated above, Plaintiffs are required to plead particularized facts giving rise to "a strong inference of knowing or intentional misconduct." *Karacand*, 53 F.Supp.2d at 1244. Merely pleading that a defendant had a motive and opportunity to commit fraud is not sufficient: "Motive, opportunity, and non-deliberate recklessness may provide some evidence of intentional wrongdoing, but are not alone sufficient to support scienter unless the totality of evidence creates a strong inference of fraud." *Id.* at 1244.

Plaintiffs' allegations that the Defendants committed fraud to enhance their credibility and maintain their executive positions are insufficient. ·(*See e.g.* ¶¶ 12, 33, 37, 77). *See Grossman v. Novell, Inc.*, 909 F.Supp. 845, 851 (D.Utah 1995) (allegation that "defendants wanted to keep their jobs and maintain their stature in the community is legally insufficient to establish motive to commit fraud"); *Chill v. General Elec. Co.*, 101 F.3d 263, 268 (2d Cir.1996) (motive to maintain the appearance of corporate profitability insufficient).

Moreover, Plaintiffs argue that the court must presume scienter because the Plaintiffs have alleged that certain material statements were false when made. Even assuming that Plaintiffs have sufficiently alleged that Defendants made incorrect statements, they have not pointed the court to any evidence that would support a finding that Defendants knew the statements were false when they made them.

Plaintiffs' specific allegations about misstatements or omissions on the part of Defendants regarding (1) channel invento-

ry, (2) side deals and discounts, (3) high demand for Novell products, are discussed below. The second amended and consolidated complaint fails to cure defects that the court identified in the amended and consolidated complaint.

### i. Channel Inventory

 The second amended and consolidated complaint alleges that, at various times during the Class Period, Defendants stated that Novell's distribution channel was not "stuffed." [6] According to Plaintiffs,

> Marengi and Tolonen stated [during November 26, 1996 and February 26, 1997 conference calls that] **Novell had maintained its channel inventories at levels even with [Second Quarter] and [Third Quarter] and thus channel inventory remained lean and reflective of end-user demand for Novell's products.** There were no excessive inventories at the Company or in the distribution channel.

(Sec. Am. & Consol. Compl. ¶ 47, 64) (bolding in the original). The second amended and consolidated complaint alleges that Defendants' channel inventory statements are actionable because when Marengi and Tolonen made those statements, the channels were stuffed, the Defendants knew the channels were stuffed, and Defendants made the statements with the intent to defraud. (*See e.g. id.* ¶ 45).

The second amended and consolidated complaint discusses channel inventory in several places. First, according to Plaintiffs, Novell stated in May 1997 that the "[c]urrent levels of product inventories are no longer appropriate." (*Id.* ¶ 74). At some unspecified date (but apparently after Novell's 3Q F97), Eric Schmidt, Chair-

man of Novell's Board and its CEO as of April 1, 1997, allegedly admitted, "we ... **had too much overhead in the company,**" and "**there was too much inventory ... [n]ot only did we not ship anything into the channel in [3Q F97], but we actually took quite a bit back.**" (*Id.* ¶ 76) (bolding in the original).

Plaintiffs ask the court to infer, based on Schmidt's statements that the product inventories were not appropriate in 3Q F97, that the channel was stuffed on November 26, 1996, and February 26, 1997. Schmidt's statements, however, do not necessarily contradict Marengi and Tolonen's earlier statements, since Schmidt did not say anything about the channel inventory during the Class Period. His statements, therefore, do not support an inference that Defendants' statements were false when made, nor do they create a strong inference that the Defendants acted with the requisite scienter.

 The second amended and consolidated complaint's also references a stuffed channel concerning Tech Data, one of Novell's distributors. According to Plaintiffs,

> Tech Data ... was required under contract with Novell to provide monthly Distribution Inventory Reports and Pull Side Reports. These reports, prepared by Joe Serra at Tech Data, were sent on a monthly basis to Linda Peterson, Novell's Distribution Channel Sales representative for Tech Data, and Ted Glahn, Regional Director for Distribution Sales. In turn, Peterson and Glahn sent these reports to Jim T. Sullivan, Vice President of Distribution Sales and defendants Marengi and Tolonen who forwarded these reports to defendant Young. The version of these reports

---

6. The inventory channel is the "river" of goods from Novell to (ultimately) end-users. Since Novell used several layers of customers above end-users, it was possible for the chan-

nel to become full or stuffed when intermediary customers had a large amount of inventory.

sent by Serra in 10/96 showed that Tech Data was only selling $9–$10 million per month of Novell products to end-users. Meanwhile, these reports also showed that Novell's sales to Tech Data exceeded $16.5 million per month and Tech Data's inventory exceeded a four- to six-month supply, $40 million in product. (*Id.* ¶ 94.) The second amended and consolidated complaint offers no particularized explanation of what the "Distribution Inventory Reports and Pull Side Reports" are, when they were made, how they were made, what they said, who read them, why Plaintiffs believe Defendants read them, when Defendants supposedly read them, or if they were reliable.

Since the Plaintiffs fail to specify reasons why Defendants' channel inventory statements were misleading when made and fail to state particular facts showing that the Defendants acted with the requisite scienter, these allegations in the second amended and consolidated complaint fail to satisfy the pleading requirements of the Reform Act. *Accord Karacand,* 53 F.Supp.2d 1236; *Caprin v. Simon Transportation Services,* 112 F.Supp.2d 1251.

### ii. Side Deals, Discounts, and Inducements

■ The second amended and consolidated complaint alleges that, during the Class Period, Defendants stated that Novell did not offer any unusual side deals, discounting, or inducements to distributors to accept its products. (*see e.g.* Sec. Am. & Consol. Compl. ¶ ¶ 37, 47). (Hereinafter, these are collectively termed "unusual side deals"). The complaint gives two comments Defendants made about unusual side deals. The first comment was allegedly made by Marengi and Tolonen during a November 26, 1996 conference call: "Marengi and Tolonen stated ... **Novell had achieved its strong 4Q sales without engaging in any special promotional pricing, discounting or other unusual inducements to distributors to accept product,** except for limited exchange rights for distributors who accepted NetWare 4.0 earlier in 4Q, which was not significant." (*Id.* ¶ 47) (bolding in original). The second statement was allegedly made during a February 26, 1997 conference call: "Marengi and Tolonen stated ... Novell had achieved its strong 1Q F97 results without engaging in any special promotional pricing, discounting or other unusual inducements to distributors to accept product." (*Id.* ¶ 64). Plaintiffs allege that these statements are actionable because when the statements were made, Novell had entered into various unusual side deals with distributors, the Defendants knew such deals had been made, and Defendants made the statements with the intent to defraud. (*See e.g. id.* ¶ ¶ 72, 82).

In discussing the unusual side deals, the second amended and consolidated complaint quotes Schmidt's acknowledgment (at some point after 3Q F97) of such deals: "**[W]hen we did the initial account reviews, we discovered ... there would be deals that were in place but there was a side letter. Or there was a verbal understanding.**" (*Id.* ¶ 76) (bolding in the original). Schmidt's statements are vague and conclusory. There is no indication, for example, what side letters or verbal understandings Schmidt is talking about, when such agreements were entered into, or whether those agreements were "unusual inducements," as Plaintiffs allege. Schmidt's comments do not support an inference that Defendants' statements were false when made.

Another reference to unusual side deals is the following:

Following Marengi's edict to make the targeted sales numbers, Novell's distribution sales force, including the Regional Directors of Distribution Sales, offered inducements through various side

agreements with distributors giving them risk-free consignment terms, allowing them to perpetually return or rotate 100% of unsold product, allowing them to exchange product for different, more expensive versions, granting additional discounts and extending payment terms to distributors up to 180 days. (*Id.* ¶ 82). While some side deals are alleged with some degree of specificity, these allegations, however, fail to meet the pleading requirements under the Reform Act. Instead of alleging specifics, the second amended and consolidated complaint fails to plead dates and amount of any specific distributor transaction or that in fact Novell did not properly account for any transaction. Similarly, Plaintiff fails to provide factual basis for whether distributors were offered extended payment terms of "up to 180 days," nor if the 180 day extension was an "unusual inducement." In sum, the second amended and consolidated complaint provides no factual support for Plaintiffs' allegations that Defendants gave unusual side deals during the Class Period, that Defendants knew such agreements were given, or that Defendants acted with scienter.

Since the Plaintiffs fail to specify reasons why Defendants' statements about unusual side deal were misleading when made and fail to state particular facts showing that the Defendants acted with the requisite scienter, these allegations in the second amended and consolidated complaint fail to satisfy the pleading requirements of the Reform Act. *Accord Karacand*, 53 F.Supp.2d 1236; *Caprin v. Simon Transportation Services*, 112 F.Supp.2d 1251.

### iii. Demand

In several places, the second amended and consolidated complaint alleges that Defendants made several statements touting the high demand for Novell's new products. (*See, e.g.*, Sec. Am. & Consol. Compl. ¶¶ 44, 55 ("Novell Inc. today reported **broad market acceptance** of its intranet and Internet platform....") (bolding in original); *id.* ¶ 37 ("Demand was also good for Novell's new GroupWise 5.0 and ManageWise products.")). Plaintiffs allege that these statements were false when made, because demand for some or all of Novell's products was not high. (*See, e.g.*, *id.* ¶ 55 ( "GroupWise 5.0, upon release, had several 'bugs' resulting in increasing high product failures and malfunctions which not only hurt demand ... [but also] hurt its results in the future.")).

The second amended and consolidated complaint fails to specify reasons why Defendants' statements about product demand were misleading when made and fails to state particular facts showing that the Defendants acted with the requisite scienter. The unsupported accusation that product demand was weak is insufficient to state a claim of securities fraud. *See Grossman*, 120 F.3d at 1123 ("Mere conclusory allegations of falsity are insufficient."). Hence, the second amended and consolidated complaint fails to satisfy the pleading requirements of the Reform Act. *Accord Karacand*, 53 F.Supp.2d 1236; *Caprin v. Simon Transportation Services*, 112 F.Supp.2d 1251.

### 2. Improper Accounting

Plaintiffs allege that Novell's reported 4Q F96 and 1Q F97 results, filed with the SEC and signed by Marenig, Tolonen, Messman, and Bond, were the result of improper accounting. (*See* Sec. Am. & Consol. Compl. ¶¶ 79–80). The second amended and consolidated complaint alleges that Defendants prematurely recognized OEM customer revenue (*see id.* ¶¶ 103–135); entered into certain improper side agreements with distributors (*see e.g. id.* ¶¶ 78, 82); made certain improper

"in transit sales" (*see id.* ¶¶ 78, 136, 159); sold products in the gray market (*see id.* ¶¶ 137–142); and failed to increase Novell's reserve accounts (*see id.* ¶¶ 78, 143–145). Plaintiffs allege that some or all of these activities violated the Generally Accepted Accounting Principles ("GAAP") and were materially misleading. (*See e.g. id.* ¶¶ 78, 131–133).

### a. Premature Recognition of OEM Customer Revenue

#### i. Violation of GAAP

■ According to the second amended and consolidated complaint, "Defendants caused Novell to report materially false and misleading financial results by improperly recording revenue on OEM deals during 4Q F96 and 1Q F97." (*Id.* ¶ 106). The complaint alleges that Marengi told Novell's sales division to ignore the possibility that OEM customers might not pay for certain products. (*See id.* ¶ 106).

Allegations about improper revenue recognition are not alleged with sufficient particularity; they are vague, unspecific and unsupported. (*See, e.g., id.* ¶ 107 ("During Q4–1996 and Q1–1997, numerous OEM deals were prematurely and improperly recognized."); *id.* ¶ 108 ("I believe in late fiscal 1996 and early 1997, revenue was improperly and prematurely recognized on several OEM transactions. . . .")). These unsupported statements are clearly not actionable. *See Karacand,* 53 F.Supp.2d at 1242.

■ Paragraphs 103 through 135 are preceded by the heading "Improper Revenue Recognition–OEM Deal." The most specific and detailed allegation concerns a contract between Novell and Ansel, an OEM customer. (*See* Sec. Am. & Consol. Compl. ¶ 109–113). According to paragraph 109:

In 4Q F96, Novell improperly recognized $4 million on a deal with Ansel. . . . Novell's Accounting and Credit

Departments recognized that Ansel did not have the ability to pay the $4 million in 4Q F96 and expressed concerns that the revenue for this prepaid royalty deal should not be recognized up front. Additionally, Novell did not deliver the software to Ansel in that quarter. These problems notwithstanding, Novell's senior management recorded the revenue anyway.

(*See id.* ¶ 109; *see also id.* ¶ 112).

Plaintiff's allege that these decisions were a "blatant disregard of specific recommendations not to record revenue, and GAAP, SEC rules, and Novell's Revenue Recognition Guidelines. . ." (*See id.* ¶ 106).

Even assuming that Plaintiffs sufficiently allege that Novell's practices violated GAAP, they have not stated a claim under the securities laws. When a company's filings with the SEC fail to comport entirely with GAAP, the company is not automatically liable under the securities laws. *See In re Comshare, Inc. Sec. Litig.,* 183 F.3d 542, 553 (6th Cir.1999) (failure to follow GAAP does not, by itself, establish a securities fraud claim, because plaintiffs must also show scienter). In this case, Plaintiffs offer no facts which give rise to a "strong inference that the defendant acted with the required state of mind," as required under the Reform Act. *Caprin v. Simon Transportation Services,* 112 F.Supp.2d 1251. At best, the second amended and consolidated complaint alleges mere motive and opportunity to defraud, which are insufficient to maintain a claim for securities fraud. *See Karacand,* 53 F.Supp.2d at 1244.

#### ii. Violation of Internal Policies

Some paragraphs seem to allege a violation of internal Novell policies. (*See, e.g.,* Sec. Am. & Consol. Compl. ¶¶ 131–133). According to paragraph 131, for example, "The Pacific Rim was considered to be

extremely volatile, and a decision had been made to never record revenues from the Pacific Rim until the money had been collected." (*Id.* ¶ 131). These allegations fail to specify who adopted such a rule, whether this rule was ever written down or published, who knew about the rule, or whether Defendants violated the rule with the requisite scienter. In sum, these allegations are not pled with sufficient particularity.

#### b. *Improper Side Agreements*

As discussed above, the second amended and consolidated complaint fails to adequately allege that Defendants entered into any improper side agreements or that Defendants entered into such agreements with the requisite scienter. (*See infra* B(1)(b)(ii)).

#### c. *In Transit Sales*

■ The second amended and consolidated complaint alleges that Defendants improperly recognized revenue from "in transit" sales, a revenue category that "represented fictitious sales of product that had not been sold." (*Id.* ¶ ¶ 78, 136, 159). According to the Plaintiffs, during F96, the amount of revenue recognized under this category was in excess of $100 million. (*Id.*)

Plaintiffs fail to adequately plead particular facts to support this allegation. The complaint fails to identify particularized facts regarding the alleged "internal spreadsheets," specific facts or figures on which "in-transit" allegations are based, or that would show that recognition of "in-transit sales" was misleading and that would create a strong inference that Defendants acted with the requisite scienter. *See Karacand,* 53 F.Supp.2d at 1242. Finally, Plaintiffs do not allege an "in-transit" transaction.

#### d. *Failure to Increase Reserve Account*

In a separate but related allegation, Plaintiffs claim that Defendants failed to increase the reserve account. (*See* Sec. Am. & Consol. Compl. ¶ ¶ 143–145). Plaintiffs fail to provide any specific facts about the reserve account, explain why a failure to increase the reserve account would be materially misleading, or allege facts that support an inference about Defendants' scienter with respect to this allegation.

#### e. *Gray markets*

The court finds that Plaintiffs failed to cure the defects identified in the amended and consolidated complaint. (*See id.* ¶¶ 137–142).

### Conclusion

The second amended and consolidated complaint fails to meet the heightened pleading requirements required under the securities laws. The Defendants' motion to dismiss is, therefore, GRANTED.