**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**AUG 11 2003**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENGH CIRCUIT

---

DOMENICO PIRRAGLIA, BELLA
PASTERNAK, BERNARD
PASTERNAK, MOHAMAD S.
BAKIZADA, HENRIETTE
BAKIZADA, MICHAEL C. DODGE,
GARY M. GOODMAN, PETER
COLE, ANTONIO TRIPODI, LESLIE
I. HANDLER, on behalf of themselves
and all others similarly situated,

     Plaintiffs - Appellants,

v.

NOVELL, INC., JOSEPH A.
MARENGI, JAMES R. TOLONEN,
JOHN A. YOUNG,

     Defendants - Appellees.

No. 02-4077

---

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 99-CV-995-C)**

---

Susan K. Alexander (Patrick J. Coughlin and Sanford Svetcov of Milberg, Weiss,
Bershad, Hynes & Lerach LLP, San Francisco, California; Eric A. Isaacson and
Henry Rosen of Milberg, Weiss, Bershad, Hynes & Lerach LLP, San Diego,
California; Richard D. Burbidge, Stephen B. Mitchell, Jason D. Boren and
Jefferson W. Gross of Burbidge & Mitchell, Salt Lake City, Utah, with her on the
briefs), Milberg, Weiss, Bershad, Hynes & Lerach LLP, San Francisco,
California, for the Plaintiffs-Appellants.

Terry T. Johnson (Daniel Turbow of Wilson, Sonsini, Goodrich & Rosati, Palo

Alto, California; Jeffrey Hunt of Parr Waddoups Brown Gee & Loveless, Salt Lake City, Utah, with him on the brief), Wilson, Sonsini, Goodrich & Rosati, Palo Alto, California, for the Defendants-Appellees.

Before **LUCERO**, **BALDOCK**, and **O'BRIEN**, Circuit Judges.

**LUCERO**, Circuit Judge.

This court is once again called upon to interpret the provisions of the Private Securities Litigation Reform Act of 1995, Pub. L. No. 104-67, 109 Stat. 737 (1995) ("Reform Act") (codified at 15 U.S.C. § 78u-4), as applied to a private securities-fraud complaint. Plaintiffs filed a securities-fraud class-action complaint against Novell, Inc. ("Novell"), asserting that Novell executives made materially false statements that induced investors to purchase Novell stock shortly before the price of shares plummeted. Applying the rigorous pleading requirements of the Reform Act, the district court dismissed plaintiffs' complaint for failure to state a claim. We conclude that plaintiffs have stated a claim with respect to an alleged "in-transit" revenue category and the recognition of revenue from Original Equipment Manufacturers ("OEMs"),[1] but not with respect to

---

[1] "An OEM, or 'original equipment manufacturer,' is a customer who licenses Novell products that it incorporates into the manufacture of its own products." (Appellees' Br. at 14 n.6.)

-2-

alleged "channel stuffing,"[2] special deals with distributors, and general statements regarding the demand for company products. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm in part and reverse in part.

**I**

Novell is a manufacturer and distributor of computer software. Faced with increasing competition in the software market, Novell announced in early 1996 that it intended to reduce the amount of inventory in its distribution channels by not shipping any new product into the channels during 2Q96.[3] This move was intended to bolster investor confidence by making Novell's revenue reports more reflective of end-user demand. At the end of the quarter, then-Executive Vice President Joseph A. Marengi informed investors that the channels were "clean worldwide now," and other Novell executives, including Chairman Robert Frankenberg and Chief Financial Officer James R. Tolonen, predicted that

---

[2] "Channels" refer to "the flow of inventory between Novell and its distributors, who maintain a supply of product to sell to end users." (Appellants' Br. at 6.) "Channel stuffing" refers to the practice of "inducing purchasers to increase substantially their purchases before they would, in the normal course, otherwise purchase products from the company." Greebel v. FTP Software, Inc., 194 F.3d 185, 202 (1st Cir. 1999).

[3] Novell's fiscal year, which runs from October 27 to October 26, is divided into quarters: the first quarter runs from October 27 to January 26, the second from January 27 to April 26, the third from April 27 to July 26, and the fourth from July 27 to October 26. We follow the shorthand of the parties in referring to the different quarters: thus the second quarter of 1996 is referred to as 2Q96.

revenue would grow in subsequent quarters. (Appellants' App. at 38–39, ¶¶25–27.)

Several months later, Novell reported its 3Q96 results, which were substantially lower than earlier projections. Novell's stock fell, and Frankenberg was forced to resign as Chairman, President, and Chief Executive Officer ("CEO") of Novell. John A. Young replaced Frankenberg as Chairman and interim CEO, and Marengi replaced him as President.

Novell's new management was under pressure to increase revenues and bolster Novell's stock price. Initial reports suggested that Novell's earnings were improving, and Novell's reported income for 4Q96 exceeded projections. Novell press releases explained the revenue growth in 4Q96 as driven by increased demand for Novell products, and, based on information allegedly provided by Novell, analysts projected continued growth in 1Q97. In February 1997, however, Novell reported that 1Q97 revenues had declined from 4Q96 levels. Novell's stock price fell from $13 to $10 in reaction to the news.

In March 1997, Novell announced that Eric Schmidt had been named Chairman and CEO of Novell. One month later, Novell announced that its 2Q97 earnings would be much lower than earlier forecast, and Novell's stock price fell to $7, where it remained for several months. Once the disappointing 2Q97 results were released, Novell announced major layoffs and proposed to reduce the level

of inventory in the channels. A few days later, Marengi was fired. Schmidt later stated that there had been "too much inventory" when he came to Novell and that special terms had been negotiated with some of Novell's distributors and customers. (Id. at 35, ¶ 13.)

In early 1998, several investors who lost money when Novell's stock price fell ("plaintiffs") filed a purported class action in the Northern District of California against Novell, Marengi, Tolonen, and Young ("defendants"), claiming violations of federal securities laws.[4] The case was transferred to the District of Utah, and plaintiffs filed a First Amended Complaint, which was dismissed. Plaintiffs' motion for leave to amend was granted, and plaintiffs filed a Second Amended Complaint. Plaintiffs allege in the Second Amended Complaint that defendants made materially false statements and issued false financial reports between November 1, 1996 and April 22, 1997 (the "Class Period") in violation of: (1) section 10(b) of the Securities Exchange Act of 1934 (the "1934 Act"), 15

---

[4] Jack L. Messman, Elaine R. Bond, and Ernst & Young were also named as defendants in the original complaint, but were subsequently dropped and are not parties to this appeal.

U.S.C. § 78j(b),[5] and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5;[6] and (2) section 20 of the 1934 Act, 15 U.S.C. § 78t(a).[7]

In the Second Amended Complaint, plaintiffs claim that defendants falsely told analysts and investors in two conference calls and other conversations (1) that demand for Novell's products was generally high; (2) that Novell had achieved strong 4Q96 and 1Q97 results "without engaging in any special promotional pricing, discounting, or other unusual inducements to distributors to accept product"; and (3) that "channel inventory remained lean and reflective of end-user demand for Novell's products." (Appellants' App. at 47–48, ¶47; 56, ¶64.) According to plaintiffs, Novell had offered special consignment sale terms, product exchanges, and discounts to various large distributors, and "Distribution Inventory Reports" and "Pull Side Reports" sent to defendants showed that these

---

[5] Section 10(b) makes it unlawful for any person to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b).

[6] Rule 10b-5 forbids any person to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b).

[7] Section 20 provides that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter . . . shall also be liable jointly and severally with and to the same extent as such controlled person . . . ." 15 U.S.C. § 78t(a).

distributors were carrying a six-month inventory backlog. (Id. at 45, ¶40; 66–68, ¶¶ 87–91.) Plaintiffs further assert (4) that defendants had engaged in accounting fraud and Novell's financial reports for 4Q96 and 1Q97 "were materially overstated." (Id. at 63, ¶79.)

Concluding that plaintiffs had not satisfied the pleading requirements of the Reform Act, the district court dismissed the Second Amended Complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted.[8] Plaintiffs appeal the district court's dismissal of the Second Amended Complaint.

## II

Since 1995, private securities-fraud complaints have been subject to the stringent pleading requirements of the Reform Act, a statute enacted to curb abuse in private securities lawsuits. City of Philadelphia v. Fleming Cos., 264 F.3d 1245, 1258 (10th Cir. 2001). Under the Reform Act, a private complaint that alleges a violation of section 10(b) of the 1934 Act and Rule 10b-5 thereunder must first "specify each statement alleged to have been misleading, the reason or

_____

[8] The district court's initial order mistakenly addressed the First Amended Complaint. Pirraglia v. Novell, Inc., No. 2:99CV995C (D. Utah Apr. 4, 2002). This order was subsequently amended to address the Second Amended Complaint. Pirraglia v. Novell, Inc., No. 2:99CV995C (D. Utah Apr. 16, 2002). The present appeal arises from the district court's order of April 16, 2002, dismissing the Second Amended Complaint.

reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, . . . [must] state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1). Second, in order to show that the defendant acted with the requisite state of mind for securities-fraud cases, i.e., scienter, the complaint must also, "with respect to each act or omission alleged to violate [the 1934 Act], state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  § 78u-4(b)(2); see also Fleming, 264 F.3d at 1257–59 (discussing the scienter requirement).

As has been noted, "an inevitable tension arises" between the strict pleading requirements of the Reform Act and the "customary latitude granted the plaintiff" under Rule 12(b)(6).  Gompper v. VISX, Inc., 298 F.3d 893, 896 (9th Cir. 2002).  A court's function on a Rule 12(b)(6) motion "is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted."  Sutton v. Utah State Sch. for the Deaf & Blind, 173 F.3d 1226, 1236 (10th Cir. 1999) (quotation omitted).  "A 12(b)(6) motion should not be granted 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'"  GFF Corp. v. Associated Wholesale Grocers, Inc., 130 F.3d 1381, 1384 (10th Cir. 1997)

(quoting Conley v. Gibson, 355 U.S. 41, 45–46 (1957)).  Because this is a question of law, we review a 12(b)(6) dismissal de novo, Grossman v. Novell, Inc., 120 F.3d 1112, 1118 (10th Cir. 1997), and, in general, "all well-pleaded factual allegations in the . . . complaint are accepted as true and viewed in the light most favorable to the nonmoving party,"  Sutton, 173 F.3d at 1236.

In Gompper, the Ninth Circuit determined that, as regards the state of mind requirement of the Reform Act, the 12(b)(6) standard has been modified by that statute.  According to the Ninth Circuit, because the Reform Act requires plaintiffs to plead facts with particularity giving rise to a "strong inference" that the defendant acted with scienter, § 78u-4(b)(2), a court considering whether scienter has been established "must consider *all* reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs."[9]  298 F.3d at 897.  At first glance, the position of the Ninth Circuit seems to be in

---

[9]  Other circuits have stated that the 12(b)(6) standard was unchanged by the Reform Act.  See Aldridge v. A.T. Cross Corp., 284 F.3d 72, 78 (1st Cir. 2002) ("Even under the [Reform Act], the district court, on a motion to dismiss, must draw all reasonable inferences from the particular allegations in the plaintiff's favor, while at the same time requiring the plaintiff to show a strong inference of scienter."); see also In re K-tel Int'l, Inc. Securities Litig., 300 F.3d 881, 889 n.6 (declining to adopt the view that plaintiffs are entitled only to "the most plausible of competing inferences"); but cf. Helwig v. Vencor, Inc., 251 F.3d 540, 553 (6th Cir. 2001) (stating that the court's "willingness to draw inferences in favor of the plaintiff remains unchanged by the [Reform Act]," but proceeding to hold that "the 'strong inference' requirement means that plaintiffs are entitled only to the most plausible of competing inferences.").

conflict with our precedent in Fleming, a case applying the Reform Act that reiterated that we accept a plaintiff's well-pleaded allegations as true and view them "in the light most favorable to the nonmoving party." 264 F.3d at 1257. In Fleming, however, we were not faced with the precise question of whether, with respect to the requirement that plaintiffs raise a "strong inference" that defendants acted with scienter, we should take into account reasonable inferences other than those urged by the plaintiffs. This is a question of first impression in this circuit.

Whether an inference is a strong one cannot be decided in a vacuum. In evaluating the strength of a plaintiff's inference of scienter, we may recognize the possibility of negative inferences that may be drawn against the plaintiff. We do so, not in a preclusive manner, but in an evaluative manner. That is to say, we consider the inference suggested by the plaintiff while acknowledging other possible inferences, and determine whether plaintiff's suggested inference is "strong" in light of its overall context. To this extent, we agree with the Ninth Circuit's holding in Gompper, and we hold that, with respect to the scienter prong of the Reform Act, we evaluate plaintiff's suggested inference in the context of other reasonable inferences that may be drawn, but our agreement ends there.

Our role at the 12(b)(6) stage is simply to determine whether the plaintiff raises a strong inference of scienter. We emphasize that this process does not involve a "weighing" of the plaintiff's suggested inference against other

-10-

inferences. Faced with two seemingly equally strong inferences, one favoring the plaintiff and one favoring the defendant, it is inappropriate for us to make a determination as to which inference will ultimately prevail, lest we invade the traditional role of the factfinder. See Sutton, 173 F.3d at 1236. Thus, we reject the position of the Sixth Circuit that "plaintiffs are entitled only to the most plausible of competing inferences." Helwig v. Vencor, Inc., 251 F.3d 540, 553 (6th Cir. 2001). If a plaintiff pleads facts with particularity that, in the overall context of the pleadings, including potentially negative inferences, give rise to a strong inference of scienter, the scienter requirement of the Reform Act is satisfied.

This holding applies only to the Reform Act's scienter provision, not to the requirement that plaintiffs specify each statement alleged to be misleading and the reasons why it is misleading. With respect to that requirement, we hold that the Reform Act and the traditional Rule 12(b)(6) standard should be reconciled as follows: while we will draw no inferences unfavorable to plaintiffs, we will likewise refuse to draw inferences in the plaintiffs' favor when doing so would allow them to make allegations "on information and belief" without satisfying the particularity requirements of the Reform Act. On the one hand, we conclude that the Reform Act does not leave Rule 12(b)(6) unchanged, because it sets forth a new requirement that, "if an allegation regarding [a] statement or omission is

-11-

made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Plaintiffs may not circumvent this requirement by asking the court to infer the existence of facts necessary to support a particular allegation. On the other hand, we do not conclude that the Reform Act has completely eviscerated our traditional Rule 12(b)(6) standard. Thus, in evaluating the misleading-statement provision of the Reform Act, to the extent that reasonable inferences can be drawn in the plaintiffs' favor without violating the strictures of the Reform Act, we will continue to do so.

We recognize the nuanced nature of the analysis required by the foregoing section. Such parsing is the result of the overlaying of the Reform Act upon established 12(b)(6) jurisprudence.

## III

As noted, to satisfy the Reform Act pleading requirements, plaintiffs must (1) specify all allegedly misleading statements and the reasons why those statements are misleading, and (2) state with particularity facts giving rise to a strong inference that defendants made those statements with the requisite scienter. 15 U.S.C. § 78u-4(b). We now consider the first prong of the Reform Act, i.e., whether plaintiffs have specified what statements are misleading and why.

**A**

The allegedly false statements attributed to defendants by plaintiffs fall into four categories: (1) general statements regarding positive demand for Novell's products, (2) statements regarding promotional pricing and discounts, (3) statements regarding overstuffed channel inventory, and (4) quarterly reports that fail to mention allegedly improper accounting practices. We analyze the statements in each category to determine whether plaintiffs "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, . . . state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).

As to the first category of statements, general comments about demand for Novell's products, we agree with the district court that these allegations fail to satisfy the pleading requirements of the Reform Act. While plaintiffs specify the upbeat statements alleged to be false or misleading, they do not state the <u>reasons</u> why those statements are false or misleading. For example, plaintiffs quote a Novell press release reporting "broad market acceptance" of its products and claiming that its sales were "fueled by customer demand." (Appellants' App. at 46, ¶44.) Plaintiffs allege no facts showing that customer demand for Novell's products was so low as to render these vague statements false or misleading.

-13-

Moreover, even if these statements passed the Reform Act pleading test, they constitute "the sort of vague statements of corporate optimism" that "courts have found not to be actionable under the securities laws." Grossman, 120 F.3d at 1119 (quotation omitted). Accordingly, the district court did not err in rejecting these claims.

The second and third categories involve statements allegedly made by Novell executives during two conference calls with investors and analysts. Specifically, plaintiffs claim that, during a conference call held on November 26, 1996, Marengi and Tolonen told "large Novell shareholders, money and portfolio managers, securities analysts, brokers and stock traders" (1) that "Novell had achieved its strong 4Q sales without engaging in any special promotional pricing, discounting or other unusual inducements to distributors to accept product, except for limited exchange rights for distributors who accepted NetWare 4.0 earlier in 4Q, which was not significant," and (2) that "Novell had maintained its channel inventories at levels even with 2Q and 3Q and thus channel inventory remained lean and reflective of end-user demand for Novell's products." (Appellants' App. at 47–48, ¶ 47.) Plaintiffs claim that nearly identical statements were made during a second conference call on February 26, 1997, as well as in "extensive

discussions" with Charles Phillips of Morgan Stanley and other analysts.[10] (Id. at 43, ¶ 37; 56, ¶ 64.)

The Reform Act provides that, where "an allegation . . . is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." § 78u-4(b)(1). According to the standard definition, a statement is made on "information and belief" when it is "not based on the firsthand knowledge of the person making the allegation"—that person, here, being the plaintiff—"but that person nevertheless, in good faith, believes the allegation to be true." Black's Law Dictionary 779 (6th ed. 1990). Because plaintiffs do not claim that they personally participated in the alleged conference calls and conversations, these allegations are made on information and belief. Thus, plaintiffs are required to "state with particularity all facts on which that belief is formed." § 78u-4(b)(1). They have not done so. Accordingly, we hold that the alleged statements regarding promotional pricing and channel inventory fail to satisfy the first prong of the Reform Act.

---

[10] Plaintiffs cite to various other statements made in analysts' reports, which they attempt to impute to Novell. Because plaintiffs do not plead with particularity facts showing that these statements were somehow adopted or endorsed by defendants, they do not survive Reform Act scrutiny. Cf. Suna v. Bailey Corp., 107 F.3d 64, 73–74 (1st Cir. 1997) (rejecting plaintiffs' claim that analysts' statements should be imputed to the defendant based solely on defendants' general proclivity to "communicate regularly with securities analysts").

Finally, plaintiffs assert that Novell's official financial statements failed to reflect various accounting shenanigans and were thus materially false. According to plaintiffs, Novell's financial reports for 4Q96 and 1Q97 were "materially overstated" due to improper accounting practices. (Appellants' App. at 63, ¶ 79.) In particular, plaintiffs contend that Marengi created an entirely fictional category of "in-transit" revenue, (id. at 87–88, ¶ 136), and that "senior management overrode and circumvented" recommendations by particular employees not to recognize revenue from certain contracts with OEMs, in violation of Novell's own Revenue Recognition Guidelines, (id. at 76–77, ¶¶ 107–08).

With respect to these accounting claims, plaintiffs clearly identify the statements alleged to be false (Novell's official financial reports). Moreover, in their discussion of the alleged fictitious "in-transit" revenue and the OEM contracts, plaintiffs adequately set forth the reasons why the alleged statements are misleading. Plaintiffs' "in-transit" allegations are attributed to Ted Glahn, a "Regional Director of Distribution Sales," (id. at 87 ¶ 136), and plaintiffs attach to their complaint declarations from Craig Davies, an "OEM revenue accountant," and Gloria Gieg, an "OEM credit manager," detailing specific instances in which Novell management recognized revenue from OEM transactions over the objections of these employees, (id. at 117–38, Exs. 2 & 3). Even if these accounting allegations are construed as having been made "on information and

-16-

belief," plaintiffs have pled the facts upon which that belief is based with sufficient particularity to satisfy the Reform Act. We conclude that plaintiffs' allegations regarding fictitious "in-transit" revenue and the recognition of revenue from OEM contracts pass scrutiny under the first prong of the Reform Act: i.e., plaintiffs have specified the statements alleged to be misleading and the reasons why they are misleading.

**B**

Because plaintiffs have met the first Reform Act test with respect to their OEM and "in-transit" accounting allegations, we proceed to examine whether plaintiffs have met the scienter requirement. In order to establish a violation of section 10(b) of the 1934 Act and Rule 10b-5 thereunder, a plaintiff must show that the defendant acted with scienter, i.e., with "intent to deceive, manipulate, or defraud." Fleming, 264 F.3d at 1258 (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12 (1976)). Under the Reform Act, when the law requires "proof that the defendant acted with a particular state of mind, the plaintiff must, "with respect to each act or omission alleged to violate [the securities laws], state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b). Thus, to survive a Rule 12(b)(6) motion, plaintiffs must plead facts with particularity giving rise to a strong inference that defendants acted with the requisite scienter.

Under Fleming, to determine "whether the plaintiffs' allegations permit a strong inference of fraudulent intent," we "look to the totality of the pleadings."[11] Id. at 1262. This does not mean, however, that we will consider allegations of scienter with respect to statements that fail to satisfy the first prong of the Reform Act. As discussed above, plaintiffs fail to support their allegations regarding special promotional deals and channel-inventory stuffing with the particularity required by the Reform Act. It would be bizarre indeed to find evidence of scienter with respect to these claims, when plaintiffs have failed to indicate with particularity that the relevant statements were actually made. In reviewing the pleadings for facts to support scienter, therefore, we focus on the allegations regarding OEM transactions and "in-transit" sales.

Plaintiffs claim that, by failing to disclose these accounting practices in their financial statements, defendants acted with intent to deceive. "[T]o establish scienter in a securities fraud case alleging non-disclosure of potentially material facts, the plaintiff must demonstrate: (1) the defendant knew of the

---

[11] Plaintiffs contend that, because the district court looked separately at each claim alleged to support a strong inference of scienter, the district court failed to consider the "totality of the pleadings" as required by Fleming, 264 F.3d at 1262. This does not necessarily follow, for the court may choose to list each claim separately before weighing them all together on the scale of the Reform Act. Nonetheless, as we conclude below that plaintiffs' allegations with respect to accounting irregularities do give rise to a strong inference of scienter, we need not decide whether the district court also erred by the particular manner in which it analyzed the various claims.

potentially material fact, and (2) the defendant knew that failure to reveal the potentially material fact would likely mislead investors." Fleming, 264 F.3d at 1261. Claims of accounting irregularities or violations of Generally Accepted Accounting Principles ("GAAP") support a claim of scienter only when "coupled with evidence that the violations or irregularities were the result of the defendant's fraudulent intent to mislead investors." Id. We also take into account evidence of "motive and opportunity," for, while these factors are typically insufficient in themselves to show scienter, they may be important to the "totality" of the pleadings. Id. at 1262.

In the instant case, plaintiffs argue that defendants had ample motive and opportunity to mislead investors. As discussed above, shortly before Marengi and Young took the reins, Novell had fired its previous executive for failing to improve the company's revenue, and Marengi was eventually fired for the same reason. While the desire to protect one's own position is shared by all company executives, see id. at 1269, the defendants in the instant case had especial cause to think that they would lose their jobs if they failed to produce results, given the recent termination of Frankenberg.[12] Moreover, defendants certainly had the opportunity to defraud investors; as the executives in charge of the firm, they had

[12] We will not, as defendants request, infer from the fact that they did not sell their Novell stock that they lacked motive to defraud investors.

-19-

control over its public statements and could influence the decisions of investors and analysts. While this evidence of motive and opportunity does not in itself establish a strong inference of scienter, we consider it in reviewing the "totality of the pleadings," id. at 1262.

In addition to alleging motive and opportunity, plaintiffs also plead direct evidence of scienter. Plaintiffs first allege that Novell's approval of certain OEM transactions constitutes bad faith. In her sworn declaration, attached to plaintiffs' complaint, Gieg points to three instances in which she recommended that Novell not recognize revenue from a particular OEM transaction, based on her conclusion that the OEM was not creditworthy, but senior management overrode her recommendation. Gieg twice specifically names defendant Marengi as the executive who approved the transactions. Davies, whose declaration is also attached to the complaint, likewise relates several instances in which revenue was recognized by senior management over the objections of his department, although he does not name the particular executives who approved the transactions. Both declarants assert that Novell was forced to write off several million dollars in bad debts as a consequence of management's decision to recognize revenue from these transactions. Plaintiffs contend that the recognition of revenue from these and similar transactions violated provisions of GAAP and Novell's internal revenue-recognition guidelines. These OEM-transaction allegations satisfy the

particularity requirement of the second prong of the Reform Act; thus the question is whether they give rise to a strong inference of scienter.

As defendants note, the mere fact that Novell executives reached a different conclusion regarding these OEM transactions does not necessarily imply bad faith. "It is equally possible to conclude that [defendants] made some incorrect accounting decisions regarding a limited number of transactions." Greebel v. FTP Software, Inc., 194 F.3d 185, 206 (1st Cir. 1999). Plaintiffs contend, however, that the recognition of revenue from these OEMs violated Novell's own revenue-recognition guidelines, which provide that "revenue is not recognized for orders that fail to pass credit or are not submitted to Credit for approval." (Appellants' App. at 111.) While these orders were apparently "submitted to Credit for approval," they did not "pass credit" according to the plaintiffs. Violation of a corporation's internal policies can support a claim of scienter when coupled with other evidence of intent to defraud, such as motive and opportunity. See Fleming, 264 F.3d at 1261 (noting that "allegations of GAAP violations or accounting irregularities" may state a claim of scienter where "coupled with evidence that the violations or irregularities were the result of . . . fraudulent intent to mislead investors" (quotation omitted)); see also Provenz v. Miller, 102 F.3d 1478, 1490 (9th Cir. 1996) (holding that evidence that defendants "violated [the company's] own policies . . . is sufficient to overcome summary judgment"). Plaintiffs claim

that defendants knew they would be fired if the price of Novell stock fell, and that they accordingly violated Novell's own revenue recognition guidelines in order to inflate company revenue projections. In our view, these facts raise a strong inference of scienter, and the ultimate determination as to the plausibility of the competing inference offered by the defendants—that they approved these transactions in good faith despite the fact that doing so violated Novell's internal guidelines—is for the factfinder. We conclude that plaintiffs' OEM-transaction allegations give rise to a strong inference of scienter.[13]

We now consider plaintiffs' strongest claim: the so-called "in-transit" allegation. According to plaintiffs,

> [t]o achieve Marengi's edict to make targeted sales numbers, Novell's corporate sales department in Utah maintained a spreadsheet which, in addition to listing revenue reported by each of Novell's regional sales directors, also contained a revenue category termed "In-transit" sales. The "In-transit" category represented fictitious sales of product that had not been sold. In 11/96, a Novell Corporate Accountant, Wes Swenson, located in Novell's corporate headquarters in Utah, maintained a distributor revenue computer

---

[13] Defendants contend that, given the relatively small amount of money involved in some of these transactions, an investor would not consider them material. See Grossman, 120 F.3d at 1119 ("A statement or omission is only material if a reasonable investor would consider it important in determining whether to buy or sell stock."). This issue is not ripe for resolution at the Rule 12(b)(6) stage. "Whether defendants could have believed during the class period that the reserves were an adequate response is a question of fact that cannot render the complaints inadequate, lest the heightened pleading requirements of the Reform Act replace the function of a trial." Fla. State Bd. of Admin. v. Green Tree Fin. Corp., 270 F.3d 645, 666 (8th Cir. 2001).

spreadsheet which listed revenue amounts significantly different from the revenue totals that had been reported to Novell's Regional Directors of Distribution Sales for F96.  According to Ted Glahn, a Regional Director of Distribution Sales, he noticed a column in the spreadsheet maintained by Swenson titled "In-transit" with revenue in excess of $100 million.  Glahn asked Swenson what the "In-transit" revenue number represented.  Swenson laughed and informed Glahn that this was a category established by Marengi in 8/96.  Swenson told Glahn that this revenue category was a fictitious number to make up the short-fall between actual and targeted sales numbers.  Marengi also instructed Swenson to prepare fictitious shipping paperwork to make it appear to the auditors and others that the goods had actually been shipped.  In addition, for some of the "In-transit" revenue ($5-$6 million), Swenson and others were instructed to order that red-box product be loaded onto trucks located on Novell's premises to make it appear that the goods had been shipped when in fact the truck sat in the parking lot and the goods were not delivered to any customers.

(Appellants' App. at 87–88 ¶ 136 (emphasis added).)  Like the OEM claims, this "in-transit" claim satisfies the particularity requirement of the second prong of the Reform Act.  Plaintiffs identify the amount of money involved (over $100 million) and name the source for the information (Glahn).[14]

---

[14]  Defendants contend that, if such a fictitious category existed, one would expect to find "a substantial volume of fictitious paperwork beyond the lone 'spreadsheet' alleged in the Complaint," and fault plaintiffs for failing to refer to such paperwork or provide details regarding the spreadsheet mentioned. (Appellees' Br. at 41.)  This is asking too much of the plaintiffs, who cannot be expected, at the pleading stage, to describe in detail documents and paperwork that would presumably be kept, if at all, in Novell's private files.  We hold that plaintiffs have sufficiently identified the source of their information regarding the "in-transit" category—Ted Glahn.  In fact, counsel for the defendants seemed to concede as much at oral argument.

Plaintiffs' allegations regarding the "in-transit" revenue category are quite damning. If we accept them as true, as we must at this stage, they establish that defendant Marengi intentionally deceived investors by fraudulently inflating company revenue estimates through the creation of a fictitious category of revenue. Thus, when this "in-transit" claim is considered alongside the demonstrated motive and opportunity for defendants to defraud investors, plaintiffs have stated facts giving rise to a strong inference of scienter.

We have not overlooked defendants' argument that plaintiffs' "in-transit" claim seems far-fetched. As defendants note, this purported gigantic fraud has apparently escaped the attention of Novell's independent auditor and other members of Novell's Finance Department, not to mention the SEC. We expect defendants vigorously to challenge this claim in subsequent proceedings. However, we decline defendants' invitation to conclude that the facts alleged by the plaintiffs are false, because nothing in the Reform Act allows us to do so. At this stage, it is not our role to evaluate the accuracy of plaintiffs' well-pleaded facts; the only questions are whether plaintiffs satisfy the Reform Act pleading requirements and whether the facts, if true, give rise to a strong inference of scienter under the securities laws. We conclude that they do, and we hold that the district court erred in dismissing these claims.

## IV

Because both the OEM allegations and the "in-transit" allegations pass scrutiny under the Reform Act, these allegations state a claim upon which relief can be granted. Thus, we **REVERSE** the district court's dismissal of plaintiff's claims regarding the recognition of revenue from OEM transactions and the alleged "in-transit" category of revenue,[15] and **REMAND** for further proceedings consistent with this opinion. In all other respects, the district court's decision is **AFFIRMED**.

---

[15] In addition to challenging the recognition of revenue from OEM contracts, plaintiffs also allege that Novell wrongly recognized income from certain distributors on what were effectively consignment sales. Although plaintiffs cite to conversations between Marengi and various Novell employees, in which Marengi allegedly directed the employees to offer various consignment sale terms, plaintiffs do not give a source for this information. We agree with defendants that plaintiffs' allegations regarding distributors do not pass muster under the Reform Act, and we affirm the district court's dismissal of alleged accounting irregularities regarding the recognition of revenue from distributors (as contrasted with OEMs).